

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. AP-77,078

---

### JASON DELACERDA, Appellant

### v.

### THE STATE OF TEXAS

---

### ON DIRECT APPEAL FROM CAUSE NO. 21284
### IN THE 356th DISTRICT COURT
### HARDIN COUNTY

---

**YEARY, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

A jury convicted Appellant of capital murder for the 2011 killing of B.L., a four-year-old child. *See* TEX. PENAL CODE § 19.03(a)(8). Based on the jury's answers to the special issues presented in the punishment phase of his trial, the trial court sentenced Appellant to death. *See* Art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. *See*

---

[1] Unless otherwise indicated, all references to "Articles" refer to the Texas Code of Criminal Procedure.

Art. 37.071, § 2(h). Appellant raises thirty-four points of error. After reviewing Appellant's points of error, we find each of them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

I.       STATEMENT OF FACTS

A.       *Guilt Phase Evidence*

In late 2010, B.L. lived with her grandmother, Wanda Bailey; her aunt, Samantha Bailey; and other family members. Wanda and Samantha took care of B.L. and had been involved in B.L.'s care since her birth. B.L. was a normal, healthy child who never had any serious injuries or illnesses. B.L.'s mother, Amanda Guidry,[2] lived in the Bailey home "off and on." Guidry began dating Appellant around December 2010. Shortly thereafter, Guidry moved in with Appellant. Around May 2011, Guidry took B.L. to live with her and Appellant in his trailer.

After Guidry took B.L., Wanda and Samantha "stopped getting to see [her]" and they became concerned. In June 2011, Samantha visited her brother who lived across the street from Appellant. Samantha knocked on the doors and windows of Appellant's trailer, but no one answered. Guidry eventually allowed Samantha inside Appellant's home.

When Samantha entered the poorly lit trailer, she saw B.L. lying "on the recliner with a bag of ice on her head." Samantha saw that B.L.'s "head was really swollen and black and purple and her eyes were like little slits." B.L. had also suffered a broken leg. Samantha held B.L. with the bag of ice on her head for twenty to thirty minutes. B.L. would not stop crying. Appellant told B.L., "[I]f you don't stop whining, don't think you can't be

---

[2] Guidry is Wanda's daughter and Samantha's sister.

punished because your aunt is here." Guidry assured Samantha that B.L. was "okay." Guidry said that B.L. had "slipped" on the cast of her broken leg and that "that's why her head was swollen."

A week or two later, Samantha returned to check on B.L. This time Samantha brought her father, her boyfriend, and Wanda. When they knocked on the door, Guidry and Appellant "took awhile to answer." When they entered the trailer, they found B.L. wrapped in covers in a back bedroom. Her head was the only visible part of her and "[i]t was still really swollen and black and purple looking." Wanda and Samantha visited B.L. once more before her death. On this final visit, B.L. seemed to be doing a "little better." She was "excited and talking about going to school."

On August 17, 2011, the Hardin County Sheriff's Office received a 9-1-1 call from a female caller at Appellant's residence. At the beginning of the recording, a male voice exclaimed something unintelligible followed by, "God damn it!" The caller sounded anxious and was sobbing. She said her four-year-old daughter was not breathing. The male voice in the background said, "She had a broke leg and a head injury at one time. She's been getting better. She's had like a seizure or something -- she's not breathing."

At 10:27 p.m. on August 17, paramedic Cassandra Walters was dispatched to Appellant's trailer in response to the 9-1-1 call. Guidry flagged her down. As Walters entered the trailer, she saw a small girl wearing only underwear lying on a floor wet with water and ice cubes. Walters said it looked "[l]ike someone had spilled a drink." Appellant was performing cardio-pulmonary resuscitation (CPR) on B.L. as the dispatcher instructed him over the phone. B.L. was not breathing and had no pulse. Walters observed that the

child had suffered multiple burns and bruising to her legs and face.[3] She was cold and pale and her lips were blue ("cyanotic"). Walters administered medications to try to start B.L.'s heart and attempted to revive her using a defibrillator, without success. Other paramedics arrived, and they transported B.L. to the hospital.

Dr. Charles Owen treated B.L. in the emergency room at the hospital that night. B.L. was "clothed only in filthy underwear." Owen said that "the general state of her body indicated multiple quite substantial injuries and trauma and wounds that were clearly sustained over a long period of time." He spent about twenty minutes trying to get B.L.'s heart beating, but she had "no meaningful neurologic function." B.L. was, "for all intents and purposes, dead when she came in and remained so."

In treating B.L., Owen observed numerous injuries to the child's body, including:

- Bruising, contusions, and injuries to her head "reflective of blunt force trauma";

- A wound above her left cheek that appeared to be a burn or caused by some type of "gouging or cutting";

- A wound over her left breast that appeared to be a healing cigarette burn which, Owen noted, was "a classic type of injury to a child";

- Another healing cigarette burn and multiple puncture wounds on her hand;

- "[I]njuries to the bottom of the feet, a pattern that . . . indicated that she had been walking on or scarred by bottle caps of some sort -- some rounded, pointed object";

- "[L]arge areas of what appeared to be healing burns on the top of one foot and . . . one of her thighs";

- "[M]ultiple rib fractures in various stages of healing";[4]

---

[3] According to B.L.'s medical records, her cast had been removed on July 25, 2011.

[4] A radiological report in evidence documents rib fractures in twelve locations.

- "[A] spiral fracture of the tibia[,]" which Owen described as "indicat[ing] high risk for non[-]accidental injury"; and

- "[S]unken eyes, dark discoloration around the eyes, just indicative of . . . issues of nutrition and hygiene and general care."

The prosecutor asked Owen whether, "[c]onsidering all of these injuries that we have gone over so far, would you state that these are accidental injuries, or would you state it's intentional?" Owen responded:

> Given the full context of all the information I had available to me, including her examination and subsequent discussions with the adults responsible for her care, it's unequivocal that this child was seriously abused over a long period of time; and these injuries are reflective of that abuse.

Owen—an emergency room physician who had treated close to 150,000 patients in his thirty-eight year career—said the abuse B.L. suffered was "[h]ead and shoulders above anything else I have ever seen in my entire career." He said she was "subjected to a long repeated and obscene level of physical abuse. It was outside of my experience. It remains outside of my experience."

Dr. Tommy J. Brown later performed B.L.'s autopsy. He noted that B.L. was four years old and weighed only thirty-two pounds. She had suffered hemorrhaging "at the back part of the head, the occipital-parietal area, the left temporal area, [and] the left frontal area." Her head injuries involved "a large amount of granulation tissue," which Brown described as "healing tissue from older injuries or within the last 24 hours to four or five days." B.L.'s forehead had six puncture wounds, one of which pierced her skull and entered her brain cavity. She had hemorrhages beneath both eyes and one on her cheek. Brown also documented a large bruise to B.L.'s rib cage, multiple older rib fractures, a recent rib fracture, a large ulceration on her right thigh, cigarette burns, and a large burn on the top

of her right foot. He said that the bruise on B.L.'s chest could not have been caused by CPR-related chest compressions. The bottoms of her feet contained circular injuries about one inch in diameter. Brown noted an injury on the back of B.L.'s left shoulder which looked like someone had sucked on B.L.'s skin "like a hickey." In addition, Brown documented contusions on B.L.'s lips, missing skin on her nose, and other injuries to her face. Like Owen, Brown noted B.L.'s spiral leg fracture, which is usually "caused by twisting of the foot or the leg."

Brown concluded that B.L.'s cause of death was "a non-accidental injury with blunt force trauma to the head." When asked how he determined that the fatal injury was non-accidental, Brown responded, "All the signs I [saw] leading up to the cause of death [were] like the baby had been tortured or abused for a long period of time."

Captain Gary Spears and Sergeant Mark Minton of the Hardin County Sheriff's Office were dispatched to the hospital in the early morning hours of August 18, 2011. They examined B.L.'s body and noted her numerous injuries. They then interviewed Appellant and Guidry separately.[5] Spears used a pocket audio recorder to record Appellant's interview.[6] Appellant said that B.L. "had a trembling incident about a month and a half to two months ago." He explained that, at that time, they were outside on the trampoline, and B.L. "was acting bad -- as usual like she does" and "she ended up bouncing off the trampoline and landing on the ground. Broke her leg. Hit her head."

---

[5] Guidry did not testify at trial, and her recorded statements were not admitted into evidence.

[6] This Court received Appellant's recorded statements in audio and/or audiovisual format only.

Appellant said they took B.L. to the hospital and the doctor told them that they "could expect swelling" and that there was "probably a slight concussion." Appellant said that he and Guidry "kept ice on it -- kept icing it down." He said that they watched B.L. "[p]retty much at all times." B.L.'s head "got better" but "probably about a week and a half, two weeks ago," her head "swole right back up." Appellant said they mentioned the swelling to the doctor when they took B.L. to get her cast removed, and the doctor told them that the swelling was normal. They continued to apply ice to B.L.'s head and bathe her in cold water, although they switched to warm baths when she started "acting funny."

Appellant said that, at around 5:30 p.m. on August 17, he and Guidry were giving B.L. a warm bath when she started "acting funny again":

> [B.L.] was like, "no, no, no, no, no" . . . "Mm, mm, mm, mm." So we thought she was messing with us. . . . Sometimes she'd be stubborn like that. . . . She started leaning back and like trying to put her head in the water. . . . So I told her to stop. . . . [Guidry] grabbed her and got her out of the bathtub. . . . After it was all over with, she was acting fine. We had asked her, "was that all just to get out of the damn bathtub?" And she was like, "yes." . . . So we looked at each other and we were like, "Damn."

Appellant told the officers that B.L. seemed fine from about 8:00 p.m. until around 10:00 p.m. when Guidry left for work, although she was "still kind of sluggish." Shortly after Guidry left, "all of the sudden [B.L.] balled her fists up" and started "to come up in the air with them." He said B.L. was making sounds again like, "nah, nah, nah, nah, nah." He called Guidry and told her, "She is doing it again. I don't know what the fuck is going on. Get here now." He said he did not call 9-1-1 before Guidry got home because B.L. was still breathing and making sounds. He said that when Guidry got home, he picked up B.L., who was "still slightly breathing" and said, "We gotta go." But Guidry told him to call 9-1-1, and he complied.

The officers asked Appellant about B.L.'s other injuries:

[Officer]:      . . . [N]ow I'm gonna be blunt with you, alright? This child has got bruises from head to toe. She's got marks from head to toe, okay?

[Appellant]:  The ones on her ass, I can say where they came from.

[Officer]:      Where did they come from?

[Appellant]:  Those came from me and [Guidry] -- about four days ago, five days ago, something like that -- paddling her. She woke up in the morning. She had been bad that morning. [Guidry] paddled her first.

[Officer]:      What did you paddle her with?

[Appellant]:  A paddle. Just, just a regular wood paddle.

[Officer]:      How thick of a wood paddle?

[Appellant]:  Uh, probably about a half an inch. I made it in wood shop when I was young.

The officers asked Appellant how B.L. received the burns on her leg. He replied that he accidentally spilled coffee on B.L. when she "staggered and hit" his recliner. The officers asked Appellant what caused the bruise in the middle of B.L.'s head. He replied, "That's from her head being swole like an egg, and also me and [Guidry] were trying to release the fluid out of it and we had popped it a couple of times -- a little pus[.]" When asked how B.L.'s ribs were broken, Appellant said, "I have no idea. We thought they were broken when we first went in with the broken leg. And we told him that her side was hurting. . . . He asked her how does it feel and she said, '[I]t's okay.'"

When asked why they did not take B.L. to the hospital for her injuries after the broken leg, Appellant said that they talked about it but that Guidry "was afraid they would take her daughter for the spanking on the butt." The officers asked, "And all that time you

[had] lived with the mother and the daughter?" Appellant answered, "Yes, Sir." When asked who "normally disciplined [B.L.]," Appellant answered, "We both did."

At the end of the hospital interview, Appellant signed a written consent form allowing the officers to search his residence. They also obtained a search warrant. When searching Appellant's trailer, investigators found cigarettes, a paddle, a push pin, bottle caps, and a battery powered device for shocking a person.

Minton began to gather timecards and similar documentation to determine Guidry's working hours during the period preceding B.L.'s death. The records showed that she worked full-time overnight shifts from around 10:00 p.m. until around 6:00 a.m. on the nights of August 13-16, 2011. On August 17, 2011, Guidry reported for work at 9:53 p.m. and clocked out at 10:16 p.m. (approximately eleven minutes before Walters was dispatched).

Later, Appellant voluntarily came to the police station to make another statement. Minton and Spears conducted a videotaped interview. They began by reading Appellant the *Miranda* warnings.[7] Appellant indicated that he understood the warnings. In this interview, Appellant repeated many of the statements he made in the hospital interview. However, he added some new information:

- When B.L.'s head began swelling and "getting tight," Appellant and Guidry wrapped a "tourniquet" around her head. They joked about how B.L. looked in the tourniquet and took a photo of it. When she complained that the tourniquet hurt, they removed it.

- Around the time the doctors removed B.L.'s cast, B.L.'s "leg just shrunk." Appellant and Guidry joked about the shrunken leg, saying that it looked like B.L. was doing a dance when she walked.

---

[7] *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

- When Appellant's coffee burned B.L.'s leg, she "jumped off the sofa screaming." The spilled coffee did not burn Appellant.

- When B.L.'s head swelled up "like a balloon," Appellant observed indentations, soft spots, and "lumps" on her head. Also, B.L. was having seizures.

- Regarding discipline, Appellant said, "Normally, I would use my hand. I would slap [B.L.] on her leg. I would slap her on her hand."

- Appellant said that he also disciplined B.L. by making her "stand in the corner" and that she "would stand there forever."

- When Appellant decided that standing in the corner was not "working," he and Guidry removed "a bottle cap off a water bottle" and put the "bottle cap on the ground." They forced B.L. to "stand on the bottle cap." He explained, "[T]hat would start hurting her like about five or ten minutes afterwards. And we would tell her, 'Do you want to stop? Do you want to get off? Yes? Well, then stop being bad.'"

- The day Appellant and Guidry paddled B.L., they struck her "about six times." That night, Appellant saw that her buttocks had "swelled up like a blister."

- Appellant conceded that the paddling was intentional and "it was wrong."

- When B.L.'s head swelled, they "popped" it with a "thumbtack" cleaned with alcohol—not a "needle," as Appellant had previously stated.

- When asked about the cigarette burn on B.L.'s chest, Appellant said he did not know what happened but speculated that "one of us dropped a damn cherry on her."

- When asked how B.L. could have suffered twelve broken ribs that were in different stages of healing, Appellant said that sometimes they would pick up B.L. and "she would pop." He said he had suspected that she had a broken rib.

- Appellant said he had noticed that B.L.'s stomach was swollen and distended, and her hair was falling out, as was Guidry's hair. He said he had joked about this, saying, "Y'all are shedding." He disagreed with the doctor's statement that B.L. was "very malnourished."

- Appellant agreed with each of the following statements: "The butt, you did"; "The bottoms of the feet, you did"; and "The pin holes in the forehead, you did."

- Appellant conceded that, despite B.L.'s severe head swelling, suspected broken rib, burns, and other injuries, they did not take her to the hospital except to treat her broken leg. He emphasized Guidry's fear that Child Protective Services (CPS) would take B.L. away from her.

At the end of the interview, the officers arrested Appellant.

Subsequently, Sergeants Jerry Roberts and Billy Malone, also from the Sheriff's Office, conducted a third interview. They read the *Miranda* warnings to the handcuffed Appellant. Roberts had attended the autopsy and spoken with Appellant's sons, J.G.D. and D.D.[8] He told Appellant that J.G.D. and D.D. had independently stated that Appellant would force B.L. to stand on bottle caps and would burn her with cigarettes if she stepped off the bottle caps. Appellant responded, "Bullshit." But he eventually conceded, "Having [B.L.] stand on bottle caps was my idea after she stood there for a long time in the corner and it wasn't working." He also admitted, "We fucked up with her ass."

Forensic scientist, Angelina Temple, analyzed DNA derived from B.L.'s fingernail scrapings. She testified that the DNA profiles from both of B.L.'s hands indicated a mixture of two individuals (B.L. was an assumed contributor). Temple said B.L.'s mother, Guidry, and Appellant's sons were "excluded as contributors to the profile[s]" obtained from both hands. For the profile from B.L.'s left-hand scrapings, Temple found that it was "140 million times more likely that the DNA came from [B.L.] and [Appellant] than . . . from [B.L.] and an unrelated, unknown individual." She concluded, "Based on the likelihood ratio results, [Appellant] cannot be excluded as a possible contributor to the profile."[9]

---

[8] The record reflects that J.G.D. was eighteen years old at the time of the trial and twelve at the time of the offense. D.D. was sixteen at the time of the trial and ten at the time of the offense.

[9] Temple said it was "inconclusive" whether Appellant could be a contributor to the DNA profile obtained from B.L.'s right-hand scrapings.

Defense counsel called no witnesses and offered no testimony. The jury charge authorized the jury to convict Appellant as a principal or a party to the offense.[10] The jury found Appellant guilty of the capital murder of a child under six as alleged in the indictment.[11]

B.      *Punishment Phase Evidence*

At the punishment phase of trial, the State's board-certified forensic psychiatrist, Lisa Douget, M.D.,[12] testified that she interviewed Appellant in early 2013. She also considered Appellant's background, history, and medical records in assessing his risk for future dangerousness. She found his risk level for future violent behavior to be "moderate" without the capital murder conviction. However, because the jury found Appellant guilty of capital murder, Douget adjusted her assessment of Appellant's risk for future violence

---

[10] The jury charge provided:

"PARTY TO AN OFFENSE" - A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both. Each party to an offense may be charged with the commission of the offense. All traditional distinctions between accomplices and principals are abolished by this section, and each party to an offense may be charged and convicted without alleging that he acted as a principal or accomplice.

"CRIMINAL RESPONSIBILITY FOR CONDUCT OF ANOTHER" - A person is criminally responsible for an offense committed by the conduct of another if: acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense; or, having a legal duty to prevent commission of the offense and acting with intent to promote or assist in its commission, he fails to make a reasonable effort to prevent commission of the offense.

[11] The current version of Texas Penal Code § 19.03(a)(8) makes it a capital felony to murder "an individual under 10 years of age," but at the time of the instant offense, the statute applied to "an individual under six years of age." *See* Act of June 17, 2005, 79th Leg., ch. 428, 2005 Tex. Gen. Laws 428 (amended 2011) (current version at TEX. PENAL CODE § 19.03(a)(8)).

[12] The record contains varying spellings and first names for this witness. We will use the witness's own spelling of her name for the court reporter.

to "moderate to high." Douget conceded that she did not review Appellant's jail records from the last six-and-a-half years,[13] and that she had not interviewed Appellant in the last five years.

Douget's risk assessment report (State's Exhibit 74A) indicated that Appellant received inpatient hospitalization at Fannin Pavilion in 1994 (at age seventeen) and 1996 (at age eighteen). He was diagnosed with "Bipolar affective disorder, mixed type, Attention deficit hyperactive disorder, Cannabis Dependence, Chronic," and "Anti-social personality disorder." The 1996 hospitalization records indicated that Appellant:

- Had threatened to kill his parents and engaged "in physical fights with them";

- Had "stole[n] his parents' property and sold it to support his drug habit";

- Was "manipulative, demanding, non-compliant, uncooperative, and abrupt with the staff and some of the other patients"; and

- "[W]as judged not dangerous to himself or others."

The report noted that Appellant had received treatment in jail while awaiting trial and had "demonstrated an improved mental state, which should remain manageable with continued medication compliance."

Amanda Henderson testified that, in 2001, she saw Appellant and her neighbor yelling at each other. At one point, Appellant drove away, and then turned around and drove back towards the neighbor at a "high rate of speed." Henderson said that, if her neighbor had not moved, Appellant "probably would have run over him." Appellant's ex-girlfriend, Jeri Shelburne, was riding in Appellant's Bronco at the time. Jeri testified that

---

[13] The record indicates that Appellant was jailed from the time of his arrest in August 2011 until his trial in February 2018.

Appellant tried to "[r]un over a guy" due to a "drug deal gone bad." He "did a big U-turn in the trailer park[,]" and drove at high speed toward the man. He "hit a culvert and flipped the Bronco," which "busted all the windows" and trapped Jeri inside the vehicle. The man Appellant had tried to run over helped her escape from the Bronco.

Jeri's husband, Joys Shelburne, testified about a separate assault. Joys pulled into a parking lot with his newborn daughter riding in a car seat next to him. Appellant approached the car and punched Joys through his open car window.

The State offered documentation of Appellant's criminal history, which included misdemeanor marijuana possession, Class B misdemeanor theft, criminal trespass, and theft by check. The State offered no evidence of prior convictions for felonies or crimes of violence.

Appellant's son, J.G.D., testified that he and his brother D.D. periodically stayed with Appellant, Guidry, and B.L. During these visits, J.G.D. witnessed Appellant abuse B.L. "[a]ll the time." J.G.D. said Appellant would punch B.L. with his fists "in her head and just everywhere; in her stomach, in her chest." B.L.'s head and "whole face" would "swell up" with bruises and black eyes. And Appellant "poked [B.L.'s] head with thumbtacks to try to drain the fluid from it being swollen." Sometimes, when Appellant punched B.L., "[s]he would be knocked out, and she would start shaking." He said that Appellant also choked B.L. "[w]ith his hands around her neck" until she lost consciousness.

J.G.D. further testified that Appellant would make B.L. "stand on the bottle caps for -- all night long, and he would make her sit in bathtubs full of ice for hours." When B.L. tried to step off of the bottle caps, Appellant "would act like he was going to burn her" with

a cigarette. While forcing B.L. to stand on the bottle caps, Appellant would also "poke her fingertips and toes with thumbtacks."

J.G.D. said Appellant would put B.L.'s panties in her mouth and make her lick the panties. Once, when J.G.D. and D.D. were riding in the car with Appellant, Appellant "reached back and twisted [B.L.'s] foot like -- looked like almost all the way around." J.G.D. said Appellant routinely kicked B.L. with his feet or his boots. Appellant also spanked B.L. with a wooden paddle "[a]s hard as he could," leaving her buttocks bruised and bleeding. The prosecutor asked, "How would [Appellant] act while these things were going on? Did he say anything, did he -- I mean, what was his demeanor?" J.G.D. answered, "He just acted like it was normal to do that to a four-year-old."

J.G.D. testified that he witnessed this sort of abuse every time he and D.D. went to Appellant's house. At first, B.L. would cry, but eventually she "got used to it" and "[s]topped crying." None of the abuse occurred when Guidry was present, though J.G.D. told her about it. J.G.D. said Appellant told B.L. that "she better not tell her mom or he would do something worse."

The defense's final witness was Dr. Edward Gripon, a psychiatrist. Gripon opined that there is no test that can reliably assess future dangerousness, and "past behavior" is "the best indicator of future behavior, particularly if there is a history of escalating past behavior." Gripon reviewed Appellant's jail records, recorded interviews, jail calls, and visits. He focused on how Appellant has "functioned and how will he function in an incarcerated setting, because that's the only option left." Gripon stated that Appellant's jail records were "pretty benign" and demonstrated that Appellant "has been able to conduct

himself [in] a reasonable manner . . . without any repeated acts of violence." Gripon concluded, "It appears as though in a prison setting . . . his risk for future violence is low."

On cross-examination, Gripon agreed that Appellant had a "temper" and his jail calls with his mother included "a lot of hollering and screaming." Appellant's jailers had to "intervene and tell him to cool off." Gripon agreed that Appellant had a list of grievances against his parents, and he blamed his parents for "this situation even now."

## II.  SUFFICIENCY OF THE EVIDENCE

In his first point of error, Appellant argues that the evidence is legally insufficient to support his conviction for capital murder as a principal or as a party. He contends that the evidence does not show that he personally struck the fatal blow or inflicted "long-term torture." He notes that Guidry was also with B.L. in the days before her death and emphasizes that he was performing CPR on B.L. when paramedics arrived.

### A.  *Relevant Law*

When determining whether the evidence is legally sufficient to support a conviction, we assess all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

> This standard accounts for the factfinder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." . . . Our review of "all of the evidence" includes evidence that was properly and improperly admitted. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.

*Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (internal citations omitted).

"Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Id.; see also Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Intent may "be inferred from the extent of the injuries and the relative size and strength" of the assailant and the victim. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *see also Lindsey v. State*, 501 S.W.2d 647, 648 (Tex. Crim. App. 1973) ("In considering whether or not an assault was committed with the intent to murder, this Court must take into account the extent of the injuries and the relative size and strength of the parties.").

We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). To prove that Appellant was guilty of capital murder, the State had to prove that he intentionally or knowingly caused the death of an individual under six years of age. TEX. PENAL CODE §§ 19.02(b)(1), 19.03(a)(8).

"Party liability is as much an element of an offense as the enumerated elements prescribed in a statute that defines a particular crime." *Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020) (quoting *In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013) (orig. proceeding)); *see also Malik*, 953 S.W.2d at 239. Under the law of parties, a "person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE § 7.01(a).

> A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the

commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]

*Id*. § 7.02(a)(2). In performing a legal sufficiency analysis in a law of parties case, "we should look at events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Padilla v. State*, 326 S.W.3d 195, 201 (Tex. Crim. App. 2010) (citing *Hooper*, 214 S.W.3d at 13).

B.     *Analysis*

The evidence before the jury revealed that the four-year-old victim, B.L., endured horrific abuse for weeks culminating in her death. From her condition at the time of her death, doctors determined that B.L. had recently suffered:

- Multiple broken ribs;

- A spiral leg fracture;

- Cigarette burns and other more serious burns;

- Bottle-cap-shaped wounds to the bottoms of her feet;

- Numerous contusions and other injuries, including an apparent "hickey" on the back of her shoulder;

- Malnutrition and neglect;

- Puncture holes due to stabbing with something like a thumbtack, one of which pierced B.L.'s skull; and

- Extensive blunt-force head trauma which ultimately caused her death.

Based on his examination of B.L.'s body, medical examiner Brown testified that the cause of her death was "a non-accidental injury with blunt force trauma to the head." He determined that B.L. "had been tortured or abused for a long period of time." Owen, an

emergency room physician with thirty-eight years of experience, said B.L. was "subjected to a long repeated and obscene level of physical abuse" that was "[h]ead and shoulders above anything else I have ever seen in my entire career."

B.L. lived in Appellant's home at the time of her death and during the three or four months preceding her death. She was in good health with no significant injuries when Guidry took her to live with Appellant. Guidry and Appellant prevented other family members, including Samantha and Wanda, from seeing B.L. for some time. Later, family members who visited B.L. found her face bruised and swollen. During one of these visits, Appellant threatened B.L.: "[D]on't think you can't be punished because your aunt is here."

Appellant's recorded statements revealed that he and Guidry shared in supervising, bathing, and disciplining B.L., and he was left alone with the child when Guidry went to work. Appellant admitted that he and Guidry had recently beaten B.L. so severely with a wooden paddle that her skin formed blisters, which still disfigured her buttocks at the time of her death. Appellant genially informed the officers that, as B.L. struggled to walk on her shrunken leg and wore the tourniquet he and Guidry fashioned for her swollen head, they joked about her appearance. Further, Appellant conceded that forcing B.L. to stand on bottle caps—which left circular wounds on her feet—was his idea.

Appellant offered an implausible account of how his spilled coffee caused severe burns on B.L.'s leg and foot while his own legs remained unscathed. He also admitted that he poked B.L.'s head repeatedly with a thumbtack in a misguided attempt to stop the swelling. Appellant's only explanation for the couple's failure to take B.L. to a hospital was Guidry's alleged fear that CPS would take the child away from her. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Attempts to conceal incriminating

evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt.").

Brown testified that B.L.'s head trauma included "granulation tissue" indicating injuries inflicted "within the last 24 hours to four or five days." We see no evidence that anyone other than Appellant and Guidry had care and custody of B.L. during the twenty-four hours to five days preceding her death on August 17, 2011. And Guidry's employment records show that she worked overnight shifts on August 13-16, suggesting that Appellant was B.L.'s only caregiver for several hours on those days.

On the night of B.L.'s death, Guidry clocked in at 9:53 p.m., then clocked out at 10:16 p.m. Appellant told police he called Guidry at work and told her, "Get here now." He said that, after she got home five to ten minutes later, he called 9-1-1. He said B.L. was still breathing at that time. However, the jury heard the 9-1-1 call recording in which the caller was a distraught woman who said her four-year-old daughter was not breathing. And when Walters arrived only a few minutes later, she found that B.L. had no pulse or respiration and was cold and cyanotic.[14] Appellant told police that they were no longer soaking B.L. in cold baths, but Walters noticed that the floor around B.L. was wet with ice cubes and water. *See Guevara*, 152 S.W.3d at 50.

---

[14] Regarding Appellant's argument that he could not have intended to kill B.L. because he was administering CPR when first responders arrived, we defer to the jury's responsibility to weigh the evidence and resolve conflicts in the evidence. *See Clayton*, 235 S.W.3d at 778. Further, we note that a rational juror could infer that a person who has intentionally or knowingly fatally injured a child in his care might seek to deflect suspicion by making visible efforts to revive the child.

Finally, forensic scientist Temple testified that the DNA profile obtained from B.L.'s left-hand fingernail scrapings was "140 million times more likely" to come from B.L. and Appellant than from B.L. and "an unrelated, unknown individual." At the same time, Appellant's teenage sons and Guidry were "excluded as contributors" to the DNA profiles obtained from B.L.'s fingernail scrapings from both hands.

Viewing the evidence in the light most favorable to the verdict, a rational juror could have deduced that Appellant intentionally or knowingly caused four-year-old B.L.'s death. *Cf. Lindsey*, 501 S.W.2d at 648. Further, the record before us contains ample evidence that Appellant—at a minimum—encouraged, directed, and aided in the offense with the intent to promote or assist in its commission. *See* TEX. PENAL CODE §§ 7.01, 7.02. In sum, a rational trier of fact could have found beyond a reasonable doubt that Appellant committed the essential elements of capital murder of a child under six. Appellant's first point of error is overruled.

III.    EXTRANEOUS BAD ACTS AND OFFENSES[15]

In his second point of error, Appellant argues that, at the guilt-innocence phase, "[t]he trial court erred in admitting evidence of extraneous bad acts and offenses, the cumulative effect of which was to cause the jury to convict Appellant on extraneous matters not alleged in the indictment." In his third through fifteenth points of error, Appellant contends that the trial court erred in admitting evidence of various bad acts, injuries, and offenses introduced through: testimony from Owen, Brown, Spears, Minton, Walters, and Samantha Bailey; Appellant's own recorded statements; and photographs, medical records,

---

[15] Appellant briefs his second through fifteenth points of error together and we will address them together.

and other evidence. Appellant notes that the indictment alleged that he intentionally and knowingly caused B.L.'s death, and the State's evidence showed her cause of death was blunt force trauma to the head. He complains that—based on the State's theory that he "tortured the decedent to death"—the trial court allowed the State to try him for "extraneous matters" beyond the indicted offense, i.e., abusive acts that did not cause B.L.'s death. He specifically lists the following bad acts:

- Forcing B.L. to stand on bottle caps, wounding and scarring her feet;

- Burning B.L.'s foot and thigh;

- Causing B.L. to have poor nutrition, hygiene, and general care;

- Causing blunt force trauma, bruises, and contusions to B.L.'s head;

- Causing long-term abuse to B.L., as evidenced by B.L.'s healing injuries;

- Causing puncture wounds to B.L.'s skull with a thumbtack;

- Burning B.L., including with cigarettes, on her body and extremities;

- Causing a spiral fracture to B.L.'s leg, "a known high-risk" for non-accidental injury;

- Breaking B.L.'s ribs, resulting in rib fractures in various stages of healing;

- Bruising B.L.'s face and body;

- Bruising B.L.'s shoulder by sucking on her skin;

- Paddling B.L.; and

- Torturing and abusing B.L. over a long period of time.

Appellant acknowledges the Texas statute that allows both parties in murder cases to offer testimony of "relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased." *See* Art. 38.36(a).

However, he argues, such evidence must still be admissible under Texas Rules of Evidence 403 and 404(b).[16] *See State v. Smith*, 5 S.W.3d 673, 679 (Tex. Crim. App. 1999) (holding evidence admissible under Article 38.36(a) may still be excluded under Rule 403 or Rule 404(b)). Appellant posits that the admission of this non-fatal injury evidence caused him significant harm, contributed to his conviction, and constituted reversible error.

A.     *Background*

Through pretrial motions, defense counsel sought to exclude testimony and physical evidence regarding B.L.'s non-fatal injuries. In the motions and in argument, Appellant relied on Rules 401, 402, 403, and 404(b), *Robbins v. State*,[17] and constitutional grounds. Defense counsel explained: "[W]hen we are talking about extraneous offense evidence, we are talking about anything outside of the window of the time of [B.L.'s] death, going back 24 to 48 hours." After the trial court denied one of Appellant's motions, counsel stated: "[T]hen we feel like we can't effectively represent him; and we would like the permission of the Court to withdraw from the case." The trial court denied the motion to withdraw.

Counsel asserted that—in reliance on *Robbins*—the defense strategy would be to "not open the door to those 404(b) issues" by questioning witnesses. At trial, the court overruled Appellant's repeated objections based on a list of legal claims in "Trial Exhibit 2." However, the court periodically gave the jurors a limiting instruction cautioning them not to consider the complained-of evidence for "character conformity."

---

[16] Unless otherwise indicated, future references to "Rules" refer to the Texas Rules of Evidence.

[17] 88 S.W.3d 256, 260 (Tex. Crim. App. 2002).

Defense counsel cross-examined only one State's witness, forensic scientist Temple. Counsel asked Temple whether blood was found under B.L.'s fingernails (it was not). He also asked her, "Based on your skills, training, and experience, people that are in proximity with each other on a regular basis, would it be uncommon or common for them to have each other's DNA?" The witness responded, "It is possible, yes."

In guilt-phase closing arguments, defense counsel challenged the State's proof of Appellant's *mens rea* and connection to the offense. Counsel argued, "[T]hey have to prove beyond a reasonable doubt [that] someone intentionally or knowingly caused this child's death. When did y'all hear that? When?" Counsel urged that there was "no evidence, not even a little bit[,]" that Appellant was "aware that his conduct was reasonably certain to cause death." He maintained that Appellant was trying to save B.L., not kill her: "He is doing CPR. He is calling 9-1-1. He is trying to save her life. He is not a party to anything." Counsel said, "[T]his is what [Appellant] admitted to[:] thumbtacks, paddling, standing on bottle caps." Counsel also pointed to Appellant's statements to police claiming that some of B.L.'s injuries were caused by a coffee spill and a trampoline fall, arguing, "Where is the person to come in and say, 'He didn't do that by accident. He did that on purpose.'"

B.    *Standard of Review*

We review a trial judge's decision on the admissibility of evidence under an abuse of discretion standard and will not reverse it if it is within the zone of reasonable disagreement. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *see also Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1991) (stating that, if the trial court "operates within the boundaries of its discretion, an appellate court should not disturb its decision, whatever it may be"). If the trial court's evidentiary ruling is correct under any

applicable theory of law, an appellate court should not disturb it, even if the trial court gave a wrong or insufficient reason for the ruling. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). "Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). We employ an abuse of discretion standard in reviewing a trial court's application of the balancing test set out in Rule 403, "although that balance is always slanted toward admission, not exclusion, of otherwise relevant evidence." *Id.*

C. *Relevance*

Under the Texas Rules of Evidence, evidence must be relevant to be admissible. *See* Rule 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Rule 401. Appellant avers that, "Only the facts that indicated appellant intentionally and knowingly caused the injury that led to the death of B.L. were relevant." For the reasons set out below, we hold that the State's evidence showing B.L. suffered non-fatal injuries—and showing Appellant inflicted those non-fatal injuries—near the time of B.L.'s death tended to make a fact of consequence more or less probable. *See* Rules 401, 402.

D. *Rule 404(b),* Res Gestae, *and* Robbins

Appellant argues that the State's use of the non-fatal abuse evidence violated Rule 404(b), which prohibits admitting evidence of specific crimes, wrongs, or acts "to prove a person's character in order to show that on a particular occasion the person acted in

accordance with the character." Rule 404(b)(1). But extraneous act evidence may be admissible for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 404(b)(2). Extraneous conduct evidence "that logically serves any of these purposes is 'relevant' beyond its tendency 'to prove the character of a person to show that he acted in conformity therewith.'" *Montgomery*, 810 S.W.2d at 387.

"Rule 404(b) is a rule of inclusion rather than exclusion" and the Rule 404(b) exceptions are neither mutually exclusive nor exhaustive. *De La Paz*, 279 S.W.3d at 343 (citing *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). Rule 404(b) "excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *Id.* The proponent of extraneous conduct evidence "need not 'stuff' a given set of facts into one of the laundry-list exceptions set out in Rule 404(b)." *Id.* Yet the proponent "must be able to explain to the trial court, and to the opponent, the logical and legal rationales that support its admission on a basis other than 'bad character' or propensity." *Id*. A "well-established rationale" is "to rebut a defensive issue that negates one of the elements of the offense." *Id*. However, the "mere denial of commission of an offense generally does not open the door to extraneous offenses." *Id*.

In murder prosecutions, Article 38.36(a) permits a party "to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." Art. 38.36(a); *see also Garcia v. State*, 201 S.W.3d 695, 702 (Tex. Crim. App.

2006). Evidence of the general nature of the relationship between the accused and the victim "is clearly admissible under this Article." *Garcia*, 201 S.W.3d at 702. "[I]n some situations, prior acts of violence between the victim and the accused may be offered to illustrate the nature of the relationship." *Id.* To be admissible, "[t]hese specific acts of violence must meet the requirements of the Rules of Evidence." *Id.*; *see also Smith*, 5 S.W.3d at 677–79.

We first address Appellant's complaints about non-fatal abuse evidence introduced through the testimony of Walters, Spears, Minton, Brown, and Owen, and Appellant's recorded statements. Most of the complained-of evidence involved injuries found on B.L.'s body at the time of her death, including bottle-cap shaped wounds on her feet, cigarette and other burns, injuries from paddling, an apparent hickey, head trauma and associated subdural hemorrhages,[18] granulation tissue from older head injuries, signs of poor hygiene and symptoms of malnutrition, a spiral leg fracture, rib fractures, and puncture wounds. These physical injuries visible on B.L.'s body were relevant circumstances uncovered during the investigation of her death, and the record suggests that B.L. sustained these injuries in May through August of 2011, while living with Appellant.

Brown and Owen acknowledged that the non-fatal injuries to B.L.—including the cigarette burns and spiral leg fracture—showed a pattern of child abuse that culminated in the severe head trauma that caused B.L.'s death. These doctors specifically considered B.L.'s non-fatal injuries as contributing factors to their medical opinions that her death was

---

[18] As the State observes in its brief, the "[e]vidence of bruising and contusions on B.L.'s head is not evidence of extraneous injuries; rather, it is the essence of the offense with which appellant was charged."

non-accidental. Brown explained that "[a]ll the signs I [saw] leading up to the cause of death [were] like the baby had been tortured or abused for a long period of time." Owen offered a similar opinion: "Given the full context of all the information I had available to me . . . it's unequivocal that this child was seriously abused over a long period of time; and these injuries are reflective of that abuse."

Although not an enumerated exception in Rule 404(b), evidence of another crime, wrong, or act also "may be admissible as same-transaction contextual evidence where 'several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony . . . of any one of them cannot be given without showing the others.'" *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011) (citing *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000)). Same-transaction contextual evidence "is admissible, not for the purpose of showing character conformity, but to illuminate the nature of the crime alleged." *Santellan v. State*, 939 S.W.2d 155, 168 (Tex. Crim. App. 1997) (citing *Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993)).

Such evidence "is considered 'res gestae,' under the reasoning that events do not occur in a vacuum, and the jury has a right to hear what occurred immediately prior to and subsequent to the commission of that act so that it may realistically evaluate the evidence." *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). However, same-transaction evidence is admissible "only when the offense would make little or no sense without also bringing in that evidence; and it is admissible 'only to the extent that it is necessary to the jury's understanding of the offense.'" *Devoe*, 354 S.W.3d at 469.

The non-fatal injury testimony of the medical professionals and law enforcement officers who examined B.L. on the day of her death (Walters, Spears, Minton, Brown, and Owen) and the associated exhibits were interwoven with the charged offense. This evidence was "so intertwined with the murder that the jury's understanding of the offense would have been obscured without it." *See Wyatt*, 23 S.W.3d at 26. This evidence was same-transaction contextual evidence and was admissible for a purpose other than character conformity. *Cf. Camacho*, 864 S.W.2d at 535.

Further, Appellant's recorded admissions that he poked B.L. with thumbtacks, paddled her so hard that he caused blisters, and made her stand on bottle caps aligned with the medical evidence showing her constellation of injuries. These admissions were relevant to the jury's determination of his motive, opportunity, and absence of accident, and they were probative of his inclination to use unorthodox and violent methods to discipline B.L. A rational juror could have found Appellant's story (that B.L. accidentally spilled his coffee causing severe burns on her leg and foot) implausible. *See Guevara*, 152 S.W.3d at 50.

Additionally, Spears's identification of a bottle cap and thumbtack found in Appellant's trailer did not constitute impermissible extraneous offense evidence. The presence of bottle caps and push pins in Appellant's trailer did not in itself constitute a "bad act" under Rule 404(b). This evidence was merely background necessary to describe the State's investigation of the case. Similarly, Samantha's observations that she saw B.L. with head injuries weeks before the offense and that she never saw B.L. with any serious injuries before B.L. lived in Appellant's trailer were not, in themselves, bad acts subject to Rule 404(b).

On the other hand, Samantha's testimony that Appellant and Guidry prevented family members from seeing B.L. and that Appellant threatened to punish B.L. while she was injured and crying could have been construed by a rational factfinder as bad acts. However, this testimony helped demonstrate Appellant's motive to punish B.L. when she was—in his words—"acting bad." *See* Rule 404(b); *see also Colone v. State*, 573 S.W.3d 249, 266–67 & n.56 (Tex. Crim. App. 2019) ("[M]otive is highly relevant, so much so that we have said, on multiple occasions in the past, that the prosecution may 'always' offer evidence to show motive.") (internal citations omitted). Samantha's testimony established Appellant's role in the home as B.L.'s disciplinarian and supported Owen's and Brown's medical opinions that B.L.'s injuries were not accidental. *See* Art. 38.36(a); Rule 404(b); *see also Garcia*, 201 S.W.3d at 703.

Even so, Appellant argues that the trial court should have refused to admit the non-fatal injury evidence because he "followed the exact procedure" outlined by this Court in *Robbins*, 88 S.W.3d 256, to avoid opening the door to extraneous offense evidence. Robbins was convicted and sentenced to life imprisonment for killing his girlfriend's seventeen-month-old daughter when left alone with the baby. *Id*. at 257–58. The defense suggested through cross-examination that Robbins loved the victim and that her death was actually caused by Sudden Infant Death Syndrome (SIDS) or incorrectly performed CPR. *Id*. The victim's mother testified that the victim had previously received a black eye, a leg injury, and bruises while in Robbins's care. *Id*. at 258–59. The trial court admitted this "relationship evidence" under Article 38.36(a) and overruled Robbins's objections under Rules 403 and 404(b). *Id*. at 259.

Robbins challenged the admission of this evidence on direct appeal. In response, the State relied on *Estelle v. McGuire*, 502 U.S. 62 (1991). *See Robbins*, 88 S.W.3d at 260. In *Estelle*, the United States Supreme Court held that "a simple plea of not guilty" still "puts the prosecution to its proof as to all elements of the crime charged," and that "a defendant's tactical decision not to contest an essential element of the offense" does not relieve the State of its burden. 502 U.S. at 69–70. The Supreme Court stated, "When offered to show that certain injuries are a product of child abuse, rather than accident, evidence of prior injuries is relevant even though it does not purport to prove the identity of the person who might have inflicted those injuries." *Id*. at 68.

However, this Court explained that Texas law creates a "catch 22," in which "a simple plea of not guilty usually does not make issues such as intent a relevant issue of consequence for purposes of determining the admissibility of relationship evidence under Rule 404(b)." *Robbins*, 88 S.W.3d at 261. Yet issues like intent are nonetheless "material issues that the prosecution must prove beyond a reasonable doubt." *Id*. We said that "the issue is whether appellant went beyond a simple plea of not guilty and put his intent at issue through vigorous cross-examination or other means (such as the presentation of various defensive theories)." *Id*. We upheld the admission of the "relationship evidence" because Robbins "went beyond simply pleading not guilty through vigorous cross-examination of the prosecution witnesses suggesting that the victim's death was caused by some means other than an intentional act." *Id*.

Although defense counsel strategically avoided "vigorous cross-examination," like Robbins's defense, Appellant's defense "went beyond a simple plea of not guilty." *See id*. Appellant put his intent at issue and presented his defensive theories through "other

means." *See id*. In his recorded statements to police, Appellant maintained that—other than the wounds he caused by paddling B.L., forcing her to stand on bottle caps, and poking her with thumbtacks—her injuries were accidental and unintentional. He noted B.L.'s fall from the trampoline and what he described as an inadvertent coffee spill. He spoke of his efforts to treat B.L.'s swelling, bathe and care for her, seek medical treatment for her, and administer CPR to her.

Defense counsel objected to the admission of Appellant's recorded statements. Nevertheless, they leveraged the statements to advance their defensive theories. In closing argument, counsel pointed to Appellant's account of the accidental coffee spill, B.L.'s fall from the trampoline, and her medical treatment following that fall. Emphasizing Appellant's consistent admissions of certain conduct, counsel tied his recorded statements to the medical evidence and attempted to spread seeds of doubt through the cross-examination of Temple. Counsel argued that the State had not proven the absence of accident or the required *mens rea* regarding B.L.'s fatal head injuries. Under these circumstances, the trial court did not abuse its discretion in deciding that the complained-of evidence was relevant and admissible for legitimate, non-character-conformity purposes. *See* Rule 404(b).

E.      *Rule 403*

If a trial court determines that Rule 404(b) does not bar admission of uncharged misconduct evidence, the opponent of the evidence may further object under Rule 403. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). Rule 403 provides that the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading

the jury, undue delay, or needlessly presenting cumulative evidence." If the opponent raises a Rule 403 objection, the trial court must conduct a balancing test, which includes the following factors:

1.    the evidence's probative value;

2.    the evidence's potential to impress the jury in some irrational, but nevertheless indelible way;

3.    the time the proponent needs to develop the evidence; and

4.    the proponent's need for the evidence.

*Colone*, 573 S.W.3d at 266.

The complained-of evidence undeniably occupied a significant amount of the jury's time during Appellant's trial. However, Owen's and Brown's medical opinions about the child's cause of death illustrate how probative the non-fatal injury evidence was in proving facts of consequence, including Appellant's motive and opportunity and the non-accidental nature of B.L.'s injuries. Given the absence of eyewitness testimony, the State needed this evidence to prove disputed issues, including Appellant's *mens rea*.

In addition, the potential for the complained-of evidence to impress the jury "in some irrational but nevertheless indelible way" was not substantial. *Cf. id.* The massive head trauma that caused B.L.'s death was her most serious injury, and it was not extraneous. The emotional impact of this small child's brutal death was unavoidable, even absent evidence of her non-fatal injuries.[19]

---

[19] Appellant also complains that the State played a Christina Aguilera song during closing argument while displaying a photo of the child victim. Defense counsel called attention to the State's use of the song after the State played it and referred generally to "that kind of emotional appeal" and "Trial Exhibit 2 stuff," to which the trial judge replied, "That is so noted, and that is true." But Appellant did not raise a contemporaneous objection before or during the song or receive

Further, the trial court gave a limiting instruction concerning the non-fatal abuse evidence, specifying its only allowed uses, and cautioning the jury not to consider the evidence for character conformity purposes. The judge periodically referred to and restated this instruction throughout the trial. The court excluded three of the State's photographic exhibits depicting Appellant's abuse, including B.L.'s paddling injuries, finding that the danger of unfair prejudice substantially outweighed their probative value.

The prohibition on character conformity evidence serves "primarily to prevent a jury, with a reasonable doubt of a defendant's guilt of the charged offense, from nevertheless convicting the defendant of the charged offense based solely on the defendant's 'wicked or criminal disposition' or solely because the defendant is a bad person generally." *Robbins*, 88 S.W.3d at 263. We see little risk of that in the instant case. The conduct at issue was perpetrated in the summer of 2011 against the same child victim named in the indictment while the victim was living with Appellant and in his care. Most of the complained-of conduct occurred so close in time to the victim's death that the resulting contusions, abrasions, swelling, burns, and other damage were still visible on her body after her death. Under these circumstances, we find that the trial court did not exceed its discretion in determining that any unfair prejudice caused by the complained-of evidence did not substantially outweigh the significant probative value of the evidence.

F.     *Cumulative Effect*

Appellant claims that the "cumulative effect" of the multiple extraneous bad acts led to his conviction and constituted reversible error. The cumulative error doctrine

---

an adverse ruling. *See* TEX. R. APP. P. 33.1. In any event, we do not see a direct connection between this song and the non-fatal abuse evidence he complains of here.

provides relief only when constitutional errors so "fatally infect the trial" that they violate the trial's "fundamental fairness." *See Estrada v. State*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010) (citations omitted). We have found no error in the trial court's admission of the complained-of evidence. Appellant has pointed us to no "authority holding that non-errors may in their cumulative effect cause error." *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999).

Because we have found that the trial court did not abuse its discretion in admitting the evidence at issue, we overrule Appellant's second through fifteenth points of error.

## IV.     CHILD VICTIM'S STATEMENT ABOUT DYING

In his sixteenth and seventeenth points of error, Appellant argues that the trial court erred in overruling his hearsay objection to Wanda's testimony about a conversation she had with B.L. "weeks or months" before B.L.'s death. He alleges that Wanda testified that B.L.—while lying in bed with her head swollen—talked about dying and told Wanda "goodbye." Appellant also argues that the trial court erred in denying his motion for a mistrial. He asserts, "Nothing could have proved more harmful than the admission of a child saying goodbye to a grandparent."[20]

### A.     *Background*

The prosecutor asked Wanda, "Did [B.L.] tell you anything?" Defense counsel objected on hearsay grounds. The State argued, "It comes in under present sense impression." The trial judge responded: "You can develop it. Let's move on. Then sustained at this time." The prosecutor then asked Wanda if B.L. seemed "to be worried

---

[20] He contends that the State exacerbated the harm by referring to this testimony during jury argument prior to playing a song. *See supra* note 18.

that she was hurt[.]" Wanda responded, "She was saying a lot of stuff -- talking to us. When I thought about it later, it was almost like she was telling us bye individually." Defense counsel again objected on hearsay grounds, urging that "we are nowhere near present sense impression." The trial court overruled this objection.

The prosecutor followed up with this question: "In fact, Ms. Bailey, did she tell you something that shook you to the ground?" Defense counsel objected again: "I'm going to object to that being leading and/or him testifying and that he is asking for hearsay." The trial judge instructed the State to "[r]ephrase the question." The prosecutor then asked the witness, "Ms. Bailey, did [B.L.] tell you something that was significant to you?" The witness replied, "She told me two different things." Defense counsel again objected on hearsay grounds. The trial court sustained the objection, saying, "I think we have to move on."

The following exchange then transpired:

[Prosecutor]:          Let me ask you: Did she state anything to you that related to her condition; "yes" or "no"?

[Wanda]:               Yes, I guess that would be what she was saying to me.

[Prosecutor]:          And what was that?

[Wanda]:               If I die, would I --

[Defense Counsel]:     Judge --

[The Court]:           Stop.

[Defense Counsel]:     Judge, this doesn't relate to her condition. I know what they are trying to get around, and it doesn't have anything to do with the present sense impression. It doesn't relate to her condition. It's not sought for medical purposes. There is not an exception that fits this

testimony. It's hearsay. It's not offered for any other purpose.

[Prosecutor]:        Your Honor, it is an exception to hearsay under 803(3), a dying deceleration [sic] and present sense impression. Both of those appl[y] as an exception to the hearsay. She already indicated --

[The Court]:         Sustained. Move on.

[Defense Counsel]:  I move to strike the answer [to] the question.

[The Court]:         Strike the hearsay answer.

[Defense Counsel]:  Judge, after that response, I would move for a mistrial as well.

[The Court]:         Denied.

When the State's attorney referred to B.L.'s statement during closing arguments, defense counsel immediately objected that the trial court had sustained counsel's earlier objection. The trial judge sustained the objection in part and overruled it in part, saying, "The jury was instructed to disregard a -- determined to be a hearsay response. Just remember the Court's instructions regarding the admissions regarding the evidence." The court denied counsel's motion for mistrial.

B.    *Analysis*

The admission of hearsay evidence in violation of the Rules of Evidence is non-constitutional error subject to a harm analysis under Texas Rule of Appellate Procedure 44.2(b). *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998); *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008). Non-constitutional error "must be disregarded" unless it affects an Appellant's "substantial rights." TEX. R. APP. P. 44.2(b). We will not overturn a criminal conviction for non-constitutional error if, after examining

the record, we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Johnson*, 967 S.W.2d at 417; *see also Taylor*, 268 S.W.3d at 592.

The trial court sustained Appellant's objections to the State's "[i]f I die" inquiry and told the jury to "strike" the witness's answers. The only part of the complained-of testimony for which the judge overruled Appellant's objections was Wanda's remark that "it was almost like she was telling us bye individually." Assuming *arguendo* that this testimony actually relayed hearsay and that the trial court abused its discretion in admitting it, we have fair assurance that any error did not influence the jury or had only a slight effect. *See Johnson*, 967 S.W.2d at 417. The trial court did not permit Wanda to fully respond to this line of questioning and gave a curative instruction. Wanda's truncated response made no mention of Appellant, and her vague statement was unlikely to prejudice the jury. We conclude that any error in the admission of this testimony did not affect Appellant's "substantial rights." *See* TEX. R. APP. P. 44.2(b). Appellant's sixteenth and seventeenth points of error are overruled.

V.      B.L.'S MEDICAL RECORDS

In Appellant's eighteenth point of error, he argues that the trial court erred in admitting over his objection State's Exhibit 67 (B.L.'s hospital records). Appellant asserts that the exhibit contained "hearsay within hearsay" and evidence of "extraneous injuries." Appellant specifically complains that the exhibit included a doctor's statement that B.L. had experienced "serious long-term child abuse" and "references to other extraneous injuries, including multiple traumas, an old fracture, multiple acute and/or healing fractures to the ribs, multiple bruises to the extremities, body, head, and face, [and] a spiral fracture to the tibia which was comminuted."

Appellant contends that, by the time these hospital records were created, B.L. "was obviously deceased." He surmises that the hearsay statements within State's Exhibit 67 were therefore not made "for the purpose of seeking medical treatment for the child." *See Garcia v. State*, 126 S.W.3d 921, 926 (Tex. Crim. App. 2004) ("The records themselves were admissible, but that does not mean that all information, from whatever source or of whatever reliability, contained within those business records is necessarily admissible."). Appellant asserts that he was harmed because the exhibit "contained allegations of long-term child abuse" which the State used to prove he caused B.L.'s death "because he must have abused her over a long period of time."

The complained-of material—consisting of clinical descriptions of various injuries found on B.L.'s body—appears on only a few pages of a packet of hospital records. One of the complained-of statements—a handwritten remark about child abuse—is nearly illegible. The statements cover the same subject matter as Brown's and Owen's testimony. We have held that the court did not err in admitting that testimony.

Even if Exhibit 67 contained inadmissible "hearsay within hearsay" and/or injuries arising from extraneous acts, this evidence was unlikely to sway the jury when compared with other, more accessible child-abuse evidence, such as Brown's and Owen's testimony. We have "fair assurance" that the alleged error "did not influence the jury, or had but a slight effect." *See Johnson*, 967 S.W.2d at 417; *see also* TEX. R. APP. P. 44.2(b). Accordingly, we overrule Appellant's eighteenth point of error.

## VI.    LAW OF PARTIES CHARGE

In his nineteenth point of error, Appellant argues that the trial court reversibly erred by instructing the jury on the law of parties and applying that law to the facts "in the

complete absence of any evidence to support the instruction." Appellant objected to the trial court's proposed instructions and tendered his own proposed instruction (Trial Exhibit 6) which omitted a parties charge.

Appellant emphasizes that he was not indicted as a party. He acknowledges that, if the evidence at trial supports a charge on the law of parties, then the court may properly charge on that law even though it was not pled in the indictment. *See Weeks*, 391 S.W.3d at 124 ("Regardless of whether it is pled in the charging instrument, liability as a party is an available legal theory if it is supported by the evidence."). But, he maintains, "Certainly the evidence herein did not demonstrate that [he] was guilty, if at all, by soliciting, encouraging, directing, aiding, or attempting to aid Amanda Guidry or any other person." He points to the State's argument urging the jury, "[D]on't get hung up. . . . He did them all. He did bodily injury. He did serious bodily injury. And he committed capital murder." Appellant argues that, because he "most assuredly objected to the court's charge," he need only show "some harm," not egregious harm. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). He argues he has shown some harm because the complained-of charge found no support in the record and expanded his criminal liability.

Even if an indictment omits the law of parties, the trial court may give the jury a parties instruction "whenever there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties." *Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999); *see also Weeks*, 391 S.W.3d at 125. Further, this Court has held that, "where the evidence clearly supports a defendant's guilt as a principal actor, any error of the trial court in charging on the law of parties is harmless." *Ladd*, 3 S.W.3d at 564–65 (citing *Black v. State*, 723 S.W.2d 674, 675 (Tex. Crim. App. 1986)).

In light of Appellant's admissions that he abused the four-year-old victim, his misleading and implausible statements about her injuries, the medical evidence, the victim's family members' testimony, and the DNA evidence from the victim's fingernail scrapings, the evidence clearly supports his guilt as a principal actor. Therefore, even if the trial court erred in charging the jury on the law of parties, any error was harmless. *See id*. His nineteenth point of error is overruled.

VII.   CONSTITUTIONALITY OF CAPITAL MURDER SENTENCING SCHEME

In his twentieth point of error, Appellant argues that the trial court erred in not granting his "motion to dismiss the death penalty" because the capital murder sentencing procedure in Article 37.071 fails to meet the minimum requirements set forth in *Furman v. Georgia*, 408 U.S. 238 (1972). He cites data from the "Capital Jury Project" which, he asserts, shows that Texas jurors "are incapable of fulfilling the requirements of *Furman*." He argues that Texas's capital sentencing scheme provides insufficient guidance to jurors concerning future dangerousness, resulting in arbitrary decisions.

In Appellant's twenty-first and twenty-second points of error, he argues that Article 37.071, §§ 2(b)(1), (e), and (f), violate his right to a trial by jury, the presumption of innocence, and his due process rights, and are arbitrary and capricious. He asserts that the provisions improperly require jurors to make long-term predictions concerning future dangerousness and decide the mitigation question "with no standard of proof or presumption of innocence." He avers that this "shifts the burden of proof on mitigation" to the defense in violation of Article I, §§ 13 and 19 of the Texas Constitution and the Eighth Amendment to the United States Constitution. He further contends that the United States Supreme Court has "in essence held that death-eligibility factors are functional equivalents

of elements of an offense[.]" He relies on *Ring v. Arizona*, 536 U.S. 584 (2002), *Jones v. United States*, 526 U.S. 227 (1999), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In addition, he argues that "the Texas sentencing scheme runs afoul of the Texas statute that provides that no person may be convicted unless each element of an offense is proved beyond a reasonable doubt." *See* Art. 38.03.

In his twenty-third point of error, Appellant argues that the trial court reversibly erred in denying his motion to quash the indictment because Article 37.071, § 2, violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 10, 13, and 19 of the Texas Constitution. In his scant argument on this point, he refers to the claims alleged in his pretrial motion and offers conclusory assertions that the statute suffers from nineteen "specific failings" to meet "constitutional muster." He does not detail those specific failings, nor does he cite relevant supporting authorities.

In his twenty-fourth point of error, Appellant argues that the trial court reversibly erred in denying his motion asking that the court find Article 37.071, § 2(f)(4), unconstitutional. Section 2(f)(4) requires that the trial court charge the jurors that in answering the mitigation special issue, they shall consider mitigating evidence to be "evidence that a juror might regard as reducing the defendant's moral blameworthiness." He contends that this definition violates the Eighth and Fourteenth Amendments to the United States Constitution and "causes jurors to disregard any potentially relevant mitigating evidence that does not relate to a defendant's moral blameworthiness." *See Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982).

In his twenty-fifth point of error, Appellant argues that the trial court reversibly erred in denying his motion asking that the court declare Article 37.071 "to be

unconstitutional based upon its unreliability" because the statutory scheme violates the Eighth and Fourteenth Amendments to the United States Constitution and unspecified parts of the Texas Constitution. He refers broadly to DNA-based exonerations, innocent people convicted of capital crimes, the State's use of psychiatric testimony, and allegedly misleading provisions "concerning the inability of the jury to agree on a death sentence." Appellant refers generally to claims he alleged in a motion he filed in the trial court and does not cite applicable cases or explain how the sentencing statute abridges his constitutional rights.

In his twenty-sixth point of error, Appellant argues that the trial court reversibly erred in denying his motion to declare the "10-12 Rule" unconstitutional. *See* Art. 37.071, §§ 2(d)(2), 2(f)(2). Appellant argues that the statutory language "misdirects and misinforms jurors concerning the effects of [their] votes on the special issues" and does not permit the court or the parties to tell the jurors what will happen if they fail to agree. He maintains that the 10-12 Rule creates "constitutionally impermissible arbitrariness" and denies appellants the "right to individualized sentencing," in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

In his twenty-seventh point of error, Appellant argues that the trial court reversibly erred in denying his motion to preclude the death penalty because the indictment did not include the "factual determinations [that] must be made in order to warrant the death penalty." He argues that these determinations are "equivalent to elements" and "should be alleged by the grand jury" so that "an accused may mount a meaningful defense." Appellant relies on the federal due process clause and Article 21.03, which states that "[e]verything

should be stated in an indictment which is necessary to be proved." *See also* TEX. CONST. art. I, § 10, art. V, § 12 (governing indictments).

We have previously rejected arguments substantially similar to Appellant's constitutional challenges. *See Buntion v. State*, 482 S.W.3d 58, 105–06 (Tex. Crim. App. 2016) (rejecting a claim that the future dangerousness special issue is "constitutionally infirm under the Eighth and Fourteenth Amendments" and that capital juries cannot accurately predict future dangerousness); *Soliz v. State*, 432 S.W.3d 895, 904–05 (Tex. Crim. App. 2014) (rejecting claims that the indictment failed to incorporate allegations regarding the punishment special issues and that Article 37.071 shifts the mitigating evidence burden to the defendant); *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009) (rejecting a claim that the mitigation issue unconstitutionally permits "the very type of open-ended discretion condemned in *Furman*" and challenging to the 10-12 Rule); *Woods v. State*, 152 S.W.3d 105, 121 & n.66 (Tex. Crim. App. 2004) (rejecting a claim that the mitigation special issue impermissibly gives the jury unfettered discretion and permits the arbitrary and capricious imposition of the death penalty); *Blue v. State*, 125 S.W.3d 491, 501 (Tex. Crim. App. 2003) (rejecting a constitutional challenge based on *Ring* and *Apprendi*); *Jones v. State*, 944 S.W.2d 642, 655–56 (Tex. Crim. App. 1996) (rejecting claims that the Texas death penalty has been arbitrarily imposed and is unconstitutional under the Eighth and Fourteenth Amendments and Article I, § 13 of the Texas Constitution); *Cantu v. State*, 939 S.W.2d 627, 639, 649 (Tex. Crim. App. 1997) (holding that the defendant's "global argument" was "without merit" because he had "not shown us how his specific rights were violated" and rejecting a claim that "racial discrimination continues to taint the Texas sentencing scheme"); *Lawton v. State*, 913

S.W.2d 542, 556 (Tex. Crim. App. 1995) (rejecting a challenge to Article 37.071, § 2(f)(4) based on *Eddings*).

Further, points of error twenty-three and twenty-five are inadequately briefed. *See* TEX. R. APP. P. 38.1(i); *see also Bohannan v. State*, 546 S.W.3d 166, 179 (Tex. Crim. App. 2017) (finding constitutional claim to be inadequately briefed where the appellant's language was "conclusory, [did] not make an argument, and [did] not contain any citations to appropriate authorities"). We overrule Appellant's points of error twenty through twenty-seven.

## VIII. PSYCHIATRIST'S EVALUATION OF APPELLANT

### A. *Background for Points of Error Twenty-eight, Twenty-nine, and Thirty*

The State filed a pretrial motion seeking a psychiatric examination of Appellant for competency and sanity. At a December 2012 pretrial hearing, the prosecutor explained that the State filed the motion for two reasons: (1) business records "show[ed] some problems that [Appellant] had in the past where he was under psychiatric treatment"; and (2) Appellant repeatedly asked "the jail nurse [for] medicine that he said was for his mental health and for his psychiatric well-being."

Defense counsel replied that the defense neither agreed with nor opposed the motion. Counsel explained: "If the Court wants to grant that motion, we would have no objection to the Court granting the State's motion. But we want it made known that it is not filed on behalf of the Defendant." The trial court granted the State's motion. Defense counsel asked that the court limit the doctor's questions to those concerning Appellant's present competency and sanity and not Appellant's condition at the time of the offense.

The trial court responded that the court's order "refers to [Article] 46B.021[21] and directs the examining physician to prepare the report that meets the requirements of that statute." The judge stated his intent to appoint Dr. Lisa Douget to examine Appellant and asked, "Is that okay, as far as the doctor, from the defense?" Defense counsel replied, "Subject to our earlier statements, Your Honor."

The State subsequently filed another motion asking that the trial court order Douget to examine Appellant for all purposes including an assessment of his future dangerousness. The State argued that it had a "right and duty to be ready to combat any contingency that may be brought forward by the defendant at any stage of the trial." At a January 2013 pretrial hearing, the State complained that the defense made statements indicating that they might hire a future dangerousness expert but had not complied with the court's deadline for designating their experts. The prosecutor argued that the defense's failure to disclose

---

[21] Article 46B.021 provides in relevant part:

(a) On a suggestion that the defendant may be incompetent to stand trial, the court may appoint one or more disinterested experts to:

   (1) examine the defendant and report to the court on the competency or incompetency of the defendant; and

   (2) testify as to the issue of competency or incompetency of the defendant at any trial or hearing involving that issue.

(b) On a determination that evidence exists to support a finding of incompetency to stand trial, the court shall appoint one or more experts to perform the duties described by Subsection (a).

\* \* \*

(f) If a defendant wishes to be examined by an expert of the defendant's own choice, the court on timely request shall provide the expert with reasonable opportunity to examine the defendant.

TEX. CODE CRIM. PROC. art. 46B.021.

experts forced the State to speculate about whether the defense would hire an expert and whether the expert would testify.

Defense counsel stated that they had not hired a competency expert, and they could not decide about whether to hire an expert until after they received Douget's report:

> What our position basically is: I don't know what Dr. Douget's reports are going to say; whether or not [Appellant] is competent, whether or not he is -- we have the burden of proving part of that. And we haven't sought an expert, if you want to call it, someone to say this man is not competent to go to trial.

> \*     \*     \*

> Now, whether or not that they are going to proceed with this lady -- [Dr.] Douget -- as an expert . . . I think we are entitled to see what she says, what her opinion is. And then we can get someone to be an expert to contradict whatever their experts -- but we are not in a position to determine who an expert is until such time we get something from Dr. Douget, which we don't have.

The trial judge indicated that he intended to "sign off" on the State's order allowing Douget "to examine for all purposes." But first the judge asked defense counsel, "Is that okay with you?" Counsel responded, "Yes, sir."

Counsel stated, "I have talked to some doctors. I've talked to some others, but we don't actually have a person that's going to testify at the present." Counsel added that they were "waiting for some reports . . . but we don't have them back yet. And this is after the State's examination." When the State again complained that the defense had not complied with the trial court's deadline, defense counsel responded:

> [G]etting an expert and then expecting us to name somebody to comply with whatever they are seeking from their expert doesn't really make sense [sic] why we would be able to even comply and provide an expert on an issue of future dangerousness when they don't even have a report yet on it.

Now, I think we would be entitled under the law to have their reports examined and somebody appointed. And if the Court wants to give us a continuance until that's done, we have got no problem. But we can't do that until we get the expert because I don't know what it's going to say [sic].

The prosecutor responded, "So, the only expert that we take it that . . . they are going to have is an expert on future dangerousness, depending on what [Dr.] Douget says. Is that your understanding, Your Honor? Because I want it clear." The judge said, "As of January 10th, they don't have any experts to designate and disclose. . . . That's what I heard. Fair enough?" Defense counsel responded, "Yes, sir." The trial judge said, "Okay. Great. I am going to sign the order as to the comprehensive psychiatric evaluation as -- I guess it's agreed." Defense counsel did not contradict this statement.

Douget interviewed Appellant in January and February 2013 and prepared a report on February 4, 2013. At the punishment phase, the State called Douget as its first witness. Defense counsel objected that Douget's opinion did not satisfy Rule 702.[22] The trial court allowed counsel to question Douget outside the jury's presence. Douget said that she had done risk assessments about twenty times and had previously testified as an expert. She agreed that she had never been qualified by a court to testify regarding "the future risk of danger" in a capital murder case.

Defense counsel agreed that Douget was qualified to give psychiatric opinions but objected that Douget's opinion was "stale" and not relevant because it was based on her examination of Appellant over five years prior to the 2018 trial. Counsel further objected

---

[22] Rule 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."

that Douget's opinion was not reliable because it did not take into account Appellant's six-and-a-half years of jail records showing "that [Appellant] has been a model inmate." The trial judge overruled Appellant's objection, stating that the issues Appellant raised went to "the weight of the evidence to be given by the jury."

Douget testified before the jury that Appellant posed a moderate to high risk for future dangerousness. On cross-examination, defense counsel pointed out that Appellant had no convictions for felonies or other violent offenses other than the case at bar. Douget conceded that she had not reviewed Appellant's jail records from the last six-and-a-half years. Defense counsel then elicited the following from Douget:

[Defense Counsel]: And if you wanted to know how he would act in the system; in custody in the control of sheriff's deputies and everything else, that would be one of the things you would want to factor in, right?

[Douget]: Definitely.

[Defense Counsel]: Over a period of six and a half years, you ought to be able to determine how somebody is going to act in custody, right?

[Douget]: That's correct.

[Defense Counsel]: The State hasn't given you those to review?

[Douget]: No.

[Defense Counsel]: If you were going to give an up-to-date opinion to this jury, would you think that would be important to consider?

[Douget]: Yes, that would be important.

[Defense Counsel]: And if the jail records reflected that he hasn't had any issues of violence or fights or anything else of that nature, would that impact potentially the opinion that you give to this jury?

[Douget]: Potentially.

[Defense Counsel]: And the State hasn't given you that?

[Douget]: No.

*     *     *

[Defense Counsel]: And would you agree with me that five years is a little too long to go without really interaction -- any interaction with a case to make a current assessment?

[Douget]: I mean, I like to see people a little bit, you know, more often than five years from when I do an evaluation, obviously.

[Defense Counsel]: And it might even make your opinion stale?

[Douget]: I mean, possibly.

The State then proffered Douget's full report. The defense objected. The trial court admitted a redacted version of the exhibit containing only Douget's risk assessment report (State's Exhibit 74A).[23] After another witness testified, the State recalled Douget to the stand to ask her about a record that she considered in preparing her risk assessment report: a discharge summary from Appellant's 1996 inpatient hospitalization. The discharge summary reported that Appellant had threatened to kill his parents.

Defense counsel then elicited the following:

[Defense Counsel]: And you didn't interview his mother?

[Douget]: No.

[Defense Counsel]: She's the person that says that he said that?

[Douget]: That's correct.

---

[23] This exhibit is the subject of Appellant's thirty-first and thirty-second points of error and will be described in greater detail *infra*.

[Defense Counsel]:   Now [it was] 20-something years ago, right?

[Douget]:   Correct.

[Defense Counsel]:   And to your knowledge, he hasn't actually killed his parents, has he?

[Douget]:   Not to my knowledge.

The following day, the defense called Dr. Edward Gripon, a psychiatrist. Gripon had testified in court regarding risk assessments on twenty-five to thirty occasions for both the defense and the State. He reviewed Appellant's six-and-a-half years of jail records, custodial interviews, and recorded jail calls and visits. He testified that Appellant's jail records were "pretty benign" and demonstrated that Appellant "has been able to conduct himself in a reasonable manner . . . without any repeated acts of violence." Gripon opined, "It appears as though in a prison setting that [Appellant's] risk for future violence is low." He also discussed problems with using standardized risk assessments because they do not consider the constraints on the population in which the subject will be placed.

Gripon testified that dangerous defendants possess characteristics not shared by Appellant, including a "history of continued escalating violence" and "threats and fights and violent behavior in the incarcerated setting." On cross-examination, Gripon conceded that Appellant was angry, yelled at his mother, harbored grievances against those close to him, and blamed his parents for his situation.

B.   *Defense Counsel's Agreement to Allow Douget to Interview Appellant*

In his twenty-eighth point of error, Appellant contends that he was deprived of the effective assistance of counsel when his trial attorney agreed to allow Douget to interview him. Appellant asserts that, after the State moved to allow Douget to examine him for all

purposes, his counsel "made it clear that they had no intention" of offering psychiatric evidence concerning his future dangerousness, and "in fact, had no experts at that time." Yet when the trial judge asked his attorney if the State's motion was "okay with you," his counsel responded affirmatively. And when the court granted the State's motion, counsel did not object.

Appellant asserts that the State had "absolutely no right" to have Douget examine him to assess his future dangerousness unless "the defense had an expert that examined appellant and intended upon relating to the jury an opinion regarding future dangerousness." He relies on *Estelle v. Smith* and *LaGrone v. State*. *Estelle*, 451 U.S. 454, 468 (1981) (noting that a defendant "who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence[] may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding"); *LaGrone*, 942 S.W.2d 602, 610–12 (Tex. Crim. App. 1997) (holding that, when the defense demonstrates the intent to put on future dangerousness expert testimony, the trial court may order the defendant to submit to an independent, State-sponsored psychiatric exam). Thus, he argues, defense counsel had "no strategic basis" for agreeing to allow Douget to examine him. And therefore, he alleges, counsel's performance "fell below the minimum standards required for the effective assistance of counsel, and unquestionably affected the results of the case." *See Strickland v. Washington*, 466 U.S. 668, 689 (1984).

1.      Relevant Law

The Sixth Amendment right to the assistance of counsel means more than the mere presence of a lawyer; it means the right to effective assistance. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). This right does not guarantee "errorless counsel" but

rather "objectively reasonable representation." *Id.* (citing *Strickland*, 466 U.S. at 686). An appellant must satisfy *Strickland*'s two-pronged test:

> Appellant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense. Unless appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective. In order to satisfy the first prong, appellant must prove, by a preponderance of the evidence, that trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms. To prove prejudice, appellant must show that there is a reasonable probability, or a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different.

*Id*. We apply a "strong presumption that counsel's performance fell within the wide range of reasonably professional assistance." *Id*. Counsel's deficiency must be "affirmatively demonstrated in the trial record"; we will not "engage in retrospective speculation." *Id*. It is not sufficient that Appellant demonstrate, "with the benefit of hindsight," that his counsel's performance was "merely of questionable competence." *Id*. at 142–43. And when direct evidence is not available, "we will assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined." *Id*. at 143.

Further, direct appeal "is usually an inadequate vehicle" for raising an ineffective assistance of counsel claim because the record is undeveloped. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). Where counsel's reasons for the alleged deficiency do not appear in the record, "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Id.* (citing *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003)).

*Strickland* requires that we examine the totality of the circumstances and evidence presented at the trial to determine if there is a reasonable probability that—but for counsel's

deficient performance—the result of the proceeding would have been different. *Ex parte Martinez*, 330 S.W.3d 891, 900–01 (Tex. Crim. App. 2011). It is not sufficient for an appellant to show "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 901 (citing *Strickland*, 466 U.S. at 693). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "A verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id*. at 696.

"The Fifth Amendment is implicated when a mental health expert testifies against the defendant based in part on communications made by the defendant during a court-ordered psychiatric examination." *Soria v. State*, 933 S.W.2d 46, 52 (Tex. Crim. App. 1996) (citing *Smith*, 451 U.S. at 462–63). The Supreme Court has held that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him in a capital sentencing proceeding." *Id.* at 53 (citing *Smith*, 451 U.S. at 468).

However, we held in *Lagrone* and *Soria* that, if a defendant offers psychiatric testimony on the issue of future dangerousness—or plans to introduce testimony from a psychiatric expert based upon an examination of a defendant—a trial court can compel his examination by a State-sponsored psychiatric expert. *See In re Medina*, 475 S.W.3d 291, 305–06 (Tex. Crim. App. 2015) (citing *Lagrone*, 942 S.W.2d at 611); *Soria*, 933 S.W.2d at 55. We explained that "our sense of justice will not tolerate allowing criminal defendants to testify through the defense expert and then use the Fifth Amendment privilege against

self-incrimination to shield themselves from cross-examination on the issues which they have put in dispute." *Medina*, 475 S.W.3d at 306 (citing *Lagrone*, 942 S.W.2d at 611).

In *Chamberlain v. State*, the State introduced its psychiatric testimony first, and the defendant offered his expert's testimony in rebuttal. 998 S.W.2d at 234. We said that, if a defendant "breaks his silence" and voluntarily participates in a psychiatric interview with the intent to introduce the evidence, he waives the Fifth Amendment privilege. *Id.*

2.      Analysis

a.      Deficient Performance Prong

The trial court initially appointed Douget to assess Appellant's competence pursuant to Article 46B.021 and asked if defense counsel had any objection to Douget's appointment. Defense counsel expressed no objection. Three weeks later, when the State filed its second motion to allow Douget to examine Appellant for all purposes, Appellant's attorney again expressed no opposition. Counsel's comments suggest that the defense team wanted their expert to review Douget's report before making any decisions about whether a defense expert would testify. Otherwise, the record is largely silent about counsel's strategy. It is not clear whether Appellant had broken "his silence" by speaking to a psychologist or psychiatrist.[24] *Cf. id.*

"It is not sufficient that the appellant show, with the benefit of hindsight, that his counsel's actions or omissions during trial were merely of questionable competence." *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007). Where the record is silent, we ordinarily "assume that counsel had a strategy if any reasonably sound strategic motivation

---

[24] Gripon testified at the punishment phase that he was contacted "last week." But his assessment relied on a records review, not an interview with Appellant.

can be imagined." *See Lopez*, 343 S.W.3d at 143. Here, counsel has not been "afforded an opportunity to explain his actions." *See Goodspeed*, 187 S.W.3d at 392. It would be premature to find defense counsel's performance fell below an objective standard of reasonableness.

### b. Prejudice Prong

Assuming without deciding that counsel's performance was deficient, we will determine whether, in light of the totality of the circumstances, the result of Appellant's punishment proceeding would have been different but for counsel's failure to object to Douget's examination and testimony. *Cf. Strickland*, 466 U.S. at 694–95. We conclude that he has not carried his burden.

Appellant maintains that Douget's opinion that he presented a moderate to high risk of future dangerousness was irrelevant, based on "unreliable, incomplete, and outdated data," and "likely significantly misled the jury." However, Douget's testimony was not the State's strongest evidence. Though Douget testified that Appellant's risk level was moderate to high, she made several concessions that were detrimental to the State's case. She admitted that she had never before been qualified to give an opinion about future violence in a capital murder case and that she had never interviewed Appellant's mother concerning his reported threat to kill his parents. Douget conceded that she had never reviewed Appellant's jail records, nor had she spoken with Appellant in five years. She acknowledged that the jail records were important and that her assessment of Appellant could be stale.

Further, weighty evidence supported the jury's punishment verdict. Doctors testified that, at the time of her death, the four-year-old victim had suffered multiple broken

ribs, a spiral leg fracture, burns, numerous contusions and other injuries, malnutrition and neglect, and puncture wounds. This is in addition to the massive blunt-force head trauma that caused her death. As Brown opined, "the baby had been tortured or abused for a long period of time." And Owen testified that the "obscene level of physical abuse" was "[h]ead and shoulders above anything else" he had seen in his career.

Although Appellant's criminal record did not show convictions for violent offenses, the evidence revealed his history of angry outbursts, drug abuse, threats, and violence. For example, Appellant became irate about a "drug deal gone bad" and drove his Bronco at a "high rate of speed" in an attempt to "run over" a man. His Bronco hit a culvert and overturned, pinning his girlfriend inside. On another occasion, Appellant approached Joys Shelburne in a parking lot and punched him through the car window while Joys's baby was in the car.

Appellant's expert, Gripon, agreed that Appellant had a "temper" and his jail calls with his mother included "a lot of hollering and screaming." Gripon conceded that jailers had to "intervene and tell [Appellant] to cool off." Gripon also agreed that Appellant had a list of grievances against his parents and blamed them for his situation.

Finally, Appellant's teenage son, J.G.D., delivered damaging testimony that Appellant punched B.L. with his fists and abused her "[a]ll the time," causing B.L.'s head and "whole face" to "swell up." J.G.D. said that, when Appellant punched B.L., sometimes "[s]he would be knocked out, and she would start shaking." He said Appellant also choked B.L. until she lost consciousness, kicked her, and spanked her with a wooden paddle "[a]s hard as he could." Appellant would make B.L. "stand on the bottle caps for -- all night long, and he would make her sit in bathtubs full of ice for hours." When B.L. tried to step

off the bottle caps, Appellant "would act like he was going to burn her" with a cigarette. While forcing B.L. to stand on bottle caps, Appellant would "poke her fingertips and toes with thumbtacks." Once, Appellant "reached back and twisted [B.L.'s] foot . . . almost all the way around." J.G.D. said Appellant told B.L. that "she better not tell her mom or he would do something worse." When the prosecutor asked J.G.D. what Appellant's demeanor was while abusing B.L., the boy said, "He just acted like it was normal to do that to a four-year-old."

In light of the record before us, we conclude that Appellant has not demonstrated a reasonable probability that the result of his punishment proceeding would have been different but for counsel's decision to allow Douget to examine him. We overrule his twenty-eighth point of error.

C. *Defense Counsel's Failure to Object to the Admission of the Statements Appellant Made to Douget*

In his twenty-ninth point of error, Appellant contends he was deprived of effective assistance of counsel when his attorney failed to object to the admission of his statements to Douget. He maintains that there is "nothing in the record to indicate that [he] received any of the required warnings at the time he made the statements[.]" Appellant avers that the State called Douget to testify at the punishment phase "to relate damaging information gained from her interviews with appellant," including her risk assessment report. He contends that the evidence Douget obtained from her interviews with Appellant and her resulting evaluation were "absolutely inadmissible under *Estelle v. Smith*" because they violated Appellant's Fifth Amendment right to remain silent as well as his Sixth

Amendment right to counsel. *See* 451 U.S. at 462–63; *see also Miranda*, 384 U.S. at 467–76.

Appellant argues that, when the State offered Douget's testimony and records containing his unwarned statements, his counsel should have immediately raised constitutional objections. He avers there is no trial strategy that could justify counsel's oversight. Appellant concedes that his attorney did object to Douget's testimony on the bases of hearsay and lack of relevance. *See* Rules 401, 402, 801, 802.

Appellant acknowledges that we have held that the record on direct appeal is usually an inadequate vehicle for raising an ineffective assistance claim. *See Goodspeed*, 187 S.W.3d at 392. But he insists that the record in his case "demonstrates that the conduct of trial counsel was 'so outrageous that no competent attorney would have engaged in it.'" *See id*. He contends counsel's omission "unquestionably affected the outcome of the case and caused the jury to sentence [him] to death."

1.      *Estelle v. Smith*

Absent "other fully effective procedures, a person in custody must receive certain warnings before any official interrogation, including that he has a 'right to remain silent' and that 'anything said can and will be used against the individual in court.'" *Smith*, 451 U.S. at 466–67 (citing *Miranda*, 384 U.S. at 467–69). These warnings combat the "inherently compelling pressures" on the person and notify the subject of "the consequences of forgoing" the Fifth Amendment privilege, "which is the prerequisite for 'an intelligent decision as to its exercise.'" *Id*. at 467. The considerations mandating warnings prior to custodial interrogation "apply with no less force" to a pretrial psychiatric examination. *Id*.

The United States Supreme Court held that a capital defendant is entitled to *Miranda* warnings before speaking to a court-appointed psychiatrist if the prosecution seeks to admit the psychiatrist's testimony to demonstrate the defendant's future dangerousness. *Id*. at 468–69; *see also Ripkowski v. State*, 61 S.W.3d 378, 385 (Tex. Crim. App. 2001). The Supreme Court also found a violation of the Sixth Amendment right to counsel where criminal proceedings had been initiated, the defendant was represented by an attorney, and counsel was not notified that the psychiatric interview would cover the defendant's future dangerousness. *See Ripkowski*, 61 S.W.3d at 385.

2. Analysis

The record in the instant case does not reflect whether Douget gave Appellant any warnings before interviewing him. No one asked Douget at trial if she gave Appellant any warnings and her report does not address this subject. Defense counsel agreed to allow Douget to interview Appellant "for all purposes" including future dangerousness.[25] Further, defense counsel have had no opportunity to explain their actions or inactions. *Cf. Goodspeed*, 187 S.W.3d at 392. On this limited record, we cannot find that counsel's performance fell below an objective standard of reasonableness.

In addition, for the reasons set out in point of error twenty-eight, even assuming deficient performance, we hold that Appellant has not shown a reasonable probability that the result of his punishment proceeding would have been different but for counsel's failure

---

[25] Counsel's involvement here undermines Appellant's claim that he was "denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." *Cf. Smith*, 451 U.S. at 471.

to object based on Douget's alleged failure to administer *Miranda* warnings. *See Strickland*, 466 U.S. at 694. In particular, we note the heinous nature of the instant offense, the prolonged abuse Appellant inflicted on the child victim, and the minor role Douget's testimony played in the State's punishment case. We overrule Appellant's twenty-ninth point of error.

D. *Trial Court's Admission of Douget's Future Dangerousness Opinion Testimony*

In his thirtieth point of error, Appellant asserts that the trial court improperly permitted Douget to "render her opinion that appellant was a moderate to high risk for future dangerousness, despite the irrelevance of her opinion." He notes that Douget "had never been qualified by a District Court to testify concerning the future risk of danger in a capital murder case."[26] He further asserts that Douget had not spoken with Appellant in five years and had not reviewed his six-and-a-half years of jail records. He argues that her underlying data was "obviously not true." Appellant avers that Douget's opinion testimony "did not make the existence of a material fact more or less probable" because the opinion was "outdated and stale." Further, he contends that Douget "could not bridge [the] analytical gap" between her opinion and her "foundational" data (the interviews she

---

[26] To the extent that Appellant argues here that Douget was not qualified to testify, we find that this complaint does not comport with his objection at trial. *See* TEX. R. APP. P. 33.1(a)(1); *Bekendam v. State*, 441 S.W.3d 295, 300 (Tex. Crim. App. 2014) ("We are not hyper-technical in examination of whether error was preserved, but the point of error on appeal must comport with the objection made at trial."). At trial, Appellant objected that Douget's opinion was "stale"— because she examined Appellant five years prior to trial—and was not reliable because she did not consider Appellant's jail records. Further, at trial, defense counsel conceded that Douget was "qualified to give psychiatric opinions."

conducted five years before the trial). He argues that he was harmed by the admission of Douget's testimony because the jury used it to find that he was a future danger.

Assuming without deciding that the trial court erred in admitting Douget's opinion testimony, we must address "whether that error affected appellant's substantial rights to a fair sentencing trial." *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). In *Coble*, the State's forensic psychiatrist interviewed the defendant before his first trial in 1990 but did not perform any further psychiatric assessment of Coble—who accumulated eighteen years of nonviolent behavior on death row—before his second trial. *Id*. at 278–79. The expert also seemed unfamiliar with relevant forensic psychiatry literature. *Id*. at 277–78. We determined that the trial court abused its discretion in admitting the expert's testimony in light of Rule 702, *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and related cases. *Coble*, 330 S.W.3d at 277–80.

We analyzed the trial court's error under Texas Rule of Appellate Procedure 44.2(b) and found the error in admitting the State expert's testimony did not have a "substantial and injurious" effect on the jury's punishment-phase deliberations. *See id*. at 280–87. We determined that there was "ample evidence," apart from the expert's testimony, of a probability that Appellant would commit future acts of violence. *Id*. at 281, 286. Also, we found that the State expert's testimony was not "particularly powerful" and "was effectively rebutted" by the defense expert. *Id*. at 286–87. Finally, the State "barely mentioned" the expert's testimony during closing argument. *Id*. at 287.

Similarly, in the instant case, Douget did not offer strong expert testimony for the State. On cross-examination, she agreed with the defense attorney that she should have considered Appellant's jail records. She agreed that her risk assessment could be "stale."

She also admitted that she had never before been qualified to give an opinion about future violence in a capital murder case.

Further, the defense effectively rebutted Douget's testimony with the testimony of Gripon, a psychiatrist since 1975 who had testified in court regarding risk assessments on twenty-five to thirty occasions. He discussed the weaknesses of using standardized risk assessments and reviewed the jail records the State did not provide to Douget. He testified that Appellant's "pretty benign" records contained no repeated acts of violence and, "[Appellant] has made what we would call a reasonable adaptation to an incarcerated setting."

Moreover, in over 250 lines of closing argument, the State's attorneys devoted only eight to Douget's testimony. In defense counsel's closing arguments, they stressed Douget's concessions and emphasized Gripon's contrary testimony.

Furthermore, like in *Coble*, "there was ample evidence that there was a probability that appellant would commit future acts of violence" apart from Douget's testimony. *Cf. id*. at 281. We will not again summarize the punishment phase evidence; however, we note the brutal facts of the instant offense, Appellant's history of angry outbursts, and J.G.D.'s troubling testimony.

We hold that any error in admitting Douget's testimony did not have a "substantial and injurious" effect on the jury's deliberations concerning the future dangerousness special issue. *See id*. at 287. We overrule Appellant's thirtieth point of error.

E.   *Trial Court's Admission of Douget's Risk Assessment Report and Related Hearsay Testimony*

In Appellant's thirty-first point of error, he contends that the trial court erred in admitting State's Exhibit 74A (Douget's risk assessment report) over his objection. He complains that the exhibit contained "hearsay within hearsay" or "double hearsay." In his thirty-second point of error, Appellant argues that the trial court erred in allowing Douget to testify about the double hearsay material in the report. Appellant focuses on Douget's testimony about a statement in the report concerning a 1996 incident in which he threatened to kill his parents. He contends that this statement was hearsay and was not automatically admissible "simply because it was contained within [Douget's] report." He further argues that this statement was not made for the purposes of medical diagnosis or treatment, rather it "was likely made, if at all, by appellant's mother who was concerned for her own safety upon his release from hospitalization." *Cf. Garcia*, 126 S.W.3d at 926. Appellant asserts that admitting this material caused him "significant harm" as it was "an extreme example" of "a threat of criminal acts of violence that would constitute a continuing threat."

1. Background

During Douget's testimony, the State proffered her full report (State's Exhibit 74). Defense counsel objected on the basis of hearsay to the entire document and on the basis of relevance to the first two sections, which related to competency and sanity. Counsel argued that Douget's report was not a government record and asserted that it was "unfair to call them statements made for the purpose of medical evaluation because it was court ordered." Counsel requested that, if the exhibit was admitted over his objection, the exhibit "be limited to the portion of her evaluation" covered by her testimony, which is the "last four or five pages."

After questioning another witness, the State recalled Douget. The prosecutor asked her to turn to page two of her report. Defense counsel objected that the prosecutor's questions called for information in Douget's report that was "hearsay within hearsay." The State's attorney responded that Douget was "allowed to talk about what she used to form her opinion." Defense counsel stated that Douget had already "given her opinion." Counsel averred that the statement about Appellant's threat to kill his parents was "layer upon layer of hearsay" because it was a statement by a doctor recounting what Appellant's mother said about what Appellant said. The State responded that they had filed the business records affidavit as required and that defense counsel should have raised any objections before trial. The trial judge said that he understood the defense objection and he did "have concerns about that."

The State agreed to submit only Douget's risk assessment report (State's Exhibit 74A), omitting material dealing with competence and sanity. Defense counsel stated, "[I]f the Court, again, is going to admit the future danger risk assessment, I would ask that the items that she relied on that are hearsay be redacted from the document." The State indicated an intent to use a part of the report recounting that Appellant threatened to kill his parents in 1996. Defense counsel again objected. Noting Appellant's objections, the trial judge ruled: "I'm going to let her testify to what she relied on in making her report. And as far as her risk assessment [State's Exhibit 74A], the work she prepared, I don't mind that coming in as an exhibit also."

Douget prepared the risk assessment report (State's Exhibit 74A) based on her interviews with Appellant, the "HCR-20 Risk Assessment for Violence completed on 01/28/2013," Appellant's medical records, and information about the case supplied by

defense counsel. Her report addressed Appellant's "current mental state and whether his release to a less restrictive environment would create a substantial risk of bodily injury to another person or serious damage to the property of another." In the report, Douget discussed Appellant's 1996 inpatient hospitalization for "severe depression, anger, rage spells, and [a] marijuana problem." Appellant "had threatened to kill his parents and had been in physical fights with them." He also "stole his parents' property and sold it to support his drug habit." Appellant was discharged "against medical advice" because of his disruptive behavior but was "judged not dangerous to himself or others."

Although the State did not question Douget about most of her risk assessment report, the prosecutor briefly asked her whether she considered "something that indicated violence" on page two of her report. Douget answered, "Yes," noting that Appellant's 1996 inpatient hospitalization records "reported that he had threatened to kill his parents." On cross-examination, defense counsel elicited Douget's admissions that she had never interviewed Appellant's mother; the statement was made "20-something years ago"; and Appellant did not actually kill his parents. The defense called their own expert, Gripon, who testified that Appellant's six-and-a-half years of jail records were "pretty benign" and demonstrated that Appellant "has been able to conduct himself in a reasonable manner . . . without any repeated acts of violence." Gripon opined that, "in a prison setting," Appellant's "risk for future violence is low."

2.      Relevant Law

An expert may base his or her opinion on data that the expert "has been made aware of, reviewed, or personally observed." Rule 703. If experts in the field reasonably rely on this kind of data in forming an opinion, the data "need not be admissible for the

opinion to be admitted." *Id*. However, if the underlying data would otherwise be inadmissible, the opinion's proponent may not disclose the data to the jury "if their probative value in helping the jury evaluate the opinion is outweighed by their prejudicial effect." Rule 705(d).

If the court allows the proponent to disclose those facts or data the court must, upon timely request, restrict the evidence to its proper scope and instruct the jury accordingly. *Id*. We have said, "One of the greatest dangers in allowing otherwise inadmissible evidence under Rule 705 is that the jury will consider the facts and data as substantive evidence rather than as merely constituting the underlying basis for the expert's opinion." *Valle v. State*, 109 S.W.3d 500, 505–06 (Tex. Crim. App. 2003) (quoting *Cole v. State*, 839 S.W.2d 798, 815 (Tex. Crim. App. 1992) (Maloney, J., concurring on reh'g)).

For hearsay to be admissible, it must fit into a hearsay exception. *See* Rule 802. Rule 803(6) provides requirements for "records of regularly conducted activity" to be admitted as an exception to the hearsay rule, even if the declarant is available to testify. *Garcia*, 126 S.W.3d at 926 (citing Rule 803(6)). If the proponent complies with the rules of evidence, the business records themselves are admissible. However, this exception does not allow the admission of information in the business records from outside sources who have no business duty to report accurately. *See id*. at 926. Those statements must independently qualify for admission under their own hearsay exception. *Id*. at 926–27; *see also* Rule 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").

To preserve error regarding hearsay within hearsay, a defendant must specifically object to the double-hearsay content within the evidence at issue. S*ee* TEX. R. APP. P.

33.1(a)(1) (requiring that the complaining party at trial state the grounds "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context"); *see also* Rule 805. We review the trial court's ruling under an abuse of discretion standard and will not reverse the ruling if it is within the zone of reasonable disagreement. *Tillman*, 354 S.W.3d at 435.

We disregard non-constitutional error that does not affect an Appellant's "substantial rights." *See* TEX. R. APP. P. 44.2(b). We will not reverse if, after examining the record, "we have fair assurance . . . that the error did not influence the jury, or had but slight effect." *Taylor*, 268 S.W.3d at 592; *see also Garcia*, 126 S.W.3d at 927 (declining to reverse where we had "fair assurance that the error in question did not have a substantial and injurious effect or influence in determining the jury's verdict").

3.      Analysis

When the State originally offered the exhibit at issue, Appellant objected on the basis of hearsay to the entire document. Defense counsel later stated that their objection was "not to the hearsay of the document itself" but to "the items that [Douget] relied on that are hearsay." However, defense counsel only specifically addressed—and therefore only preserved—one hearsay-within-hearsay statement within this exhibit and Douget's related testimony: the assertion taken from the 1996 discharge summary that Appellant had threatened to kill his parents.[27] *See* TEX. R. APP. P. 33.1(a)(1).

---

[27] Although Appellant did not restate his hearsay-within-hearsay objection at the moment the witness testified about this statement in the exhibit, the record shows that the trial court understood and noted Appellant's objections to this material.

We assume, without deciding, that the trial court erred in admitting Appellant's mother's statement about Appellant's threat through Douget's testimony and report. *Cf. Valle*, 109 S.W.3d at 506 ("Allowing the defense to present appellant's mother's statements to the jury would have entailed a danger that the jury would consider those statements as substantive evidence."). We turn to the question of harm. *See* TEX. R. APP. P. 44.2(b); *Taylor*, 268 S.W.3d at 592; *Garcia*, 126 S.W.3d at 926–27.

After the court admitted the statement at issue, defense counsel cross-examined Douget and elicited her admissions that she had never interviewed Appellant's mother, the threat was made "20-something years ago," and Appellant did not actually kill his parents. The defense responded to Douget's testimony with Gripon's testimony that criticized standardized risk assessment tests and emphasized Appellant's years of nonviolent behavior in jail. Further, the jury was faced with the heinous facts of the instant offense and Appellant's other violent conduct.

In sum, we have fair assurance that any error did not have a substantial and injurious effect or influence on the jury's punishment verdict. We overrule Appellant's thirty-first and thirty-second points of error.

## IX.    J.G.D.'S TESTIMONY

In his thirty-third point of error, Appellant argues that the trial court erred in admitting at the punishment phase the testimony of his son, J.G.D., because the State gave insufficient notice. Appellant maintains that the State "had provided general notice of the punishment witnesses" under Article 37.07, § 3(g), but the State's general notice did not describe the subject of J.G.D.'s testimony and lacked detail.

In his thirty-fourth point of error, Appellant contends that the trial court erred in allowing J.G.D.'s testimony because the State violated "the Rule," which prohibits witnesses from collaborating or discussing their testimony.[28] Appellant asserts that, before J.G.D. testified, he met with the District Attorney and discussed his anticipated testimony with other witnesses, including his brother D.D. Appellant asserts that J.G.D. had been admonished concerning "the Rule," yet collaborated with other witnesses, and his testimony ultimately corroborated their statements. Appellant complains that, though the trial court prohibited J.G.D. and D.D. from testifying during the guilt phase, the court allowed J.G.D. to testify at the punishment phase over his objection.

Appellant argues that the trial court did not perform the analysis required by this Court in *Archer v. State*, 703 S.W.2d 664, 666–67 (Tex. Crim. App. 1986) (setting out two criteria for assessing whether a defendant is harmed by a Rule violation: (1) "did the witness actually hear the testimony or confer with another witness without court permission"; and (2) did the witness give "testimony that either corroborates another witness for the prosecution or contradicts defensive testimony on that issue").

Appellant asserts that J.G.D. testified to "damaging information," describing Appellant's brutal abuse of B.L. He declares that "[o]ne cannot conceive much worse testimony in the punishment phase of a capital murder case involving the death of a child than the testimony of this witness[.]" Further, Appellant argues, J.G.D.'s testimony

---

[28] Rule 614—known as the sequestration rule, or "the Rule"—provides in relevant part: "At a party's request, the [trial] court must order witnesses excluded so that they cannot hear other witnesses' testimony."

corroborated statements given by other witnesses; thus, he maintains, the trial court reversibly erred in allowing J.G.D. to testify at the punishment phase.

A. *Background*

On June 12, 2012, Appellant filed his "Motion for Discovery and Limiting Instructions to the Jury." In this pleading, Appellant stated:

> If the State intends to introduce in its case-in-chief evidence of other crimes, wrongs or acts other than that arising in the same transaction, the Defendant hereby gives timely notice of its right and request to have reasonable notice of such acts, in advance of trial pursuant to Texas Rule of Evidence 404(b). Further, the State should be required to advise the Court and counsel for the Defendant of the specific purpose for which such evidence is being offered. Additionally, notice of any other unadjudicated offenses that the State intends to offer evidence of during the penalty phase of the trial should be given in order to avoid any unfair surprise to this Defendant.

Appellant asked that the trial court "sustain this Motion and relief be granted as prayed for herein."

On the same day, Appellant filed his "Motion to Discover State's Extraneous and/or Unadjudicated Acts of Misconduct to be Offered at Guilt or Punishment," stating: "In order for Defendant's counsel to effectively investigate and defend against any and all extraneous and/or unadjudicated acts of misconduct that the State may present, counsel is entitled to discovery of such acts with sufficient notice." In this motion, defense counsel prayed for the trial court to "require the State to disclose any and all extraneous and/or unadjudicated acts of misconduct to Defendant's counsel on or before 30 days before trial." The trial court denied both of these motions.

In November 2017, the State included J.G.D. on a witness list it sent to defense counsel, and it also filed its second amended notice of extraneous acts. That notice included the following acts (quoted):

- Choking complainant;

- Twisting complainant's leg causing [a] spiral fracture to the femur or tibia;

- Twisting the foot of complainant;

- Inserting a push-pin to the forehead, toes, and fingers of complainant;

- Burning complainant with a cigarette;

- Causing abrasions, bodily injury and ultimately scabbing to both buttock cheeks and the right leg, upper thigh, and right top of foot of complainant by some type of scalding, burning, or paddling;

- Striking and/or hitting the complainant with defendant's hand(s) and/or fist(s) and causing injury to complainant's body;

- Causing breaks, fractures, and/or bodily injury to the ribs of the complainant;

- Causing circular marks to the bottom of the feet of complainant by causing complainant to stand on bottle caps;

- Kicking complainant;

- Causing complainant to lick her panties and/or feces;

- Tripping complainant;

- Threatening complainant; and

- Striking and/or hitting complainant with a paddle-board.

On the morning of February 22, 2018, during the guilt phase, the judge sent the jurors home for the day, saying, "We have had something come up." After the jury left, defense counsel explained:

> An issue has arisen that has been brought to our attention by the State regarding the testimony of the next two witnesses -- the final two witnesses for the State. We believe that there is an issue with how their interviews were handled by the DA's office. Again, they have brought it to our attention, which is admirable; but we believe that we need to have a factfinding hearing

with everyone that was involved in the interviews before we can even make a decision about what we have.

The State's attorneys said that one of the prosecutors held a meeting earlier that morning with Appellant's teenage sons (J.G.D. and D.D.), their mother (Jeri Shelburne), and their stepfather (Joys Shelburne), who were all on the State's witness list:

[Prosecutor One]: Yes, Your Honor. As we were proceeding this morning, I was in a rush. We brought the boys in along with their mother and stepfather, who I never met. I began to go over their potential testimony with them. I was in a rush and inadvertently did that when they were both present; and I apologize for that. I let [Prosecutor Two] know and brought it to his attention. I understand that they were not under the rule and had not been sworn in as witnesses. However, it's still, in my opinion, not proper.

[The Court]: Yes, the rule was invoked. No doubt about that. And they were not present; but y'all were aware of the rule, of course.

[Prosecutor One]: Your Honor, I inadvertently started speaking and talking about their potential testimony.

[The Court]: Okay.

[Prosecutor Two]: Also, after talking with [Prosecutor One], he assured me that he did not -- in interviewing the boys -- let them know that somebody else has already testified to something from the stand to say, hey, this is what they said. Is it anything like that? So, he didn't tell them anything anybody else said. It was merely an inadvertent violation of talking together and in just talking and saying, okay, let's go over your testimony; what you personally know and saw and heard.

The defense moved for a mistrial based on "a serious, serious mistake in a case like this." The trial court denied the motion.

After a recess, the trial judge questioned J.G.D. The boy said that, earlier that morning, he, his brother, his mother, and his stepfather had met with a prosecutor in the

prosecutor's office. All four of them sat on a couch together and discussed what would happen that day. The meeting lasted about ten or twenty minutes. They talked about "how it was going to go down[,] steps of like how we are going to have to come in here and talk about everything." He said that the prosecutor "talked about like basically what we had told him and make sure everything was 100 percent true, what we told him, before we came in here. . . . He was asking us if it was all correct."

The trial judge asked, "Did you learn anything new in this meeting at all?" J.G.D. replied, "No, sir." The judge asked, "Was there any discussion about what anyone else may have testified to?" J.G.D. again replied, "No, sir." The judge followed up: "Did this meeting help your memory? Did you remember anything new that you had not?" J.G.D. responded, "No, it was just everything that we have talked about -- pretty much before that, the same thing." The judge asked, "Were you reminded of anything that you had forgotten?" J.G.D. said, "No, sir." He said the prosecutor told him to "tell the truth."

D.D. testified that he and his brother had separately recorded videotaped statements six years before. Although their mother (Jeri) was in the room with each of them during those statements, they were the ones who were "talking the whole time." D.D. said that the "first video explains everything -- is everything that we have said." D.D. said the February 2018 meeting with the prosecutor lasted five, ten, or fifteen minutes, but it could have been longer. He said, "Well, what we went over is what we've already said to [the prosecutor]. That's how he knows what he was saying because of us. . . . And today, he was just asking us, you know, pretty much what we recall, I guess." D.D. added, "We were just going over how . . . [t]hat he abused her, you know."

The judge asked D.D., "Did you hear anything this morning that you hadn't heard before?" D.D. replied, "No sir." The judge asked if D.D. remembered "anything new" that he had not already recalled and discussed. The boy replied, "No sir." D.D. added,

> [T]he reason why our stories are, like, the same or whatever, is because we seen it the same; and there is no way that we could forget because it was tragic. I mean, it was something tragic. There is no way I can forget that. That's why both our stories are the same. Because everything we seen is stuck in our head[s].

Jeri testified that the meeting in the prosecutor's office lasted ten or fifteen minutes. She said that she did not have a good memory of the details, but the prosecutor "just went over some of the things that [J.G.D. and D.D.] had previously said" and "[t]old them to say the truth." Jeri stated that the prosecutor was "not trying to pressure them into anything, any different than what actually happened." Jeri said the prosecutor "[j]ust asked if they remembered it all; like . . . [Appellant] hitting the little girl. Everything that he has done." She also mentioned "twisting the ankle" and "[l]icking her panties" and the other things that the boys "had said previously" in their original statements.

The judge asked Jeri, "Did you hear anything new this morning that you had never heard before?" She replied, "No. No, sir." Jeri added, "Everything that we went over today was in the original video when we first came the very first day when everything happened on . . . August 18th."

The next morning, the trial court ruled that the State would not be able to call J.G.D. and D.D. to testify at the guilt phase. The State responded, "In light of the Court's ruling, we rest."

During the punishment phase, the State called Jeri to the stand. The trial court overruled defense counsel's objections based on "[Article] 37.07 and the rule violation."

Jeri testified about Appellant trying to run over a man with his Bronco after a "drug deal gone bad." She did not testify about Appellant's abuse of B.L.

Subsequently, the State called Joys to the stand. The trial court overruled defense counsel's objection on the basis of inadequate notice. Joys testified about an incident in which Appellant punched him through his car window. He did not testify about Appellant's abuse of B.L.

The State indicated its intent to call J.G.D., but not D.D., to testify. Defense counsel objected based on: (1) inadequate notice under Article 37.07, § 3(g)[29] ("It's handing us the haystack and saying, 'Here, good luck'"); and (2) the DA's Office violating the Rule by collaborating with the four witnesses "about their testimony as a group." Defense counsel argued that these witnesses had not been released from the Rule, and "[i]t was, you know, four witnesses sat in a room with the elected district attorney and discussed the witnesses' testimony; one of whom is the witness they intend to call. We believe that's absolutely unacceptable under the rule." Counsel argued that the trial court should exclude J.G.D.'s testimony because, "[i]f they collaborate and they corroborate, that's harm and that's enough."

Regarding the lack-of-notice objection, the trial judge ruled that Appellant could not claim surprise because he was provided access to his sons' videotaped statements containing the same allegations:

> I don't think that the Defense can claim any type of surprise that these witnesses are being called, given the fact that, as I understand it, they were interviewed six years ago. Apparently, there [are] some recorded statements or videotape statements. I'm sure you have had the opportunity to go over

---

[29] Article 37.071, § 2(a) requires that, in a capital case, "[t]he introduction of evidence of extraneous conduct is governed by the notice requirements of Section 3(g), Article 37.07."

those. And I would not expect this witness to testify [to] something beyond what was discussed then.

Defense counsel re-urged their "previous objection under Trial Exhibit 2" but did not contradict the trial court's assertion that counsel had the opportunity to review J.G.D.'s videotaped statement containing the same content as the witness's testimony. Counsel did not request a continuance.

Regarding the Rule violation, the trial judge stated that he had evaluated the testimony provided at the hearing and believed that J.G.D. would testify "in accordance with his oath, irrespective of that meeting." The judge found, "[i]n balancing all the considerations -- and I've balanced a lot -- I'm going to allow [J.G.D.] to testify." J.G.D.'s testimony (summarized above) described Appellant's ongoing abuse of B.L. in the months preceding her death. Defense counsel asked no questions of J.G.D.

B.   *Notice Under Article 37.07, § 3(g)*

The Code of Criminal Procedure requires the State—"[o]n timely request of the defendant"—to provide "notice of intent to introduce evidence under this article" which "shall be given in the same manner required by Rule 404(b)." Art. 37.07, § 3(g). Rule 404(b) requires "[o]n timely request by a defendant . . . the prosecutor must provide reasonable notice before trial" of the State's intent to introduce evidence of a crime, wrong, or act—"other than that arising in the same transaction—in its case-in-chief." Rule 404(b)(2). If the State

> intends to introduce an extraneous crime or bad act that has not resulted in a final conviction or a probated or suspended sentence, notice of that intent is reasonable only if the notice includes the date on which and the county in which the alleged crime or bad act occurred and the name of the alleged victim of the crime or bad act.

*Id.*

The State's duty to provide "reasonable notice" of intent to introduce certain extraneous offenses is triggered by a "timely request" by the accused. *Mitchell v. State*, 982 S.W.2d 425, 427 (Tex. Crim. App. 1998). However, in this case, Appellant filed discovery motions requesting that the court require the State to provide notice. A discovery motion that requests a ruling from the trial court—"namely an order from the court directing the State to produce evidence"—is not effective until the trial court rules on the motion. *Id.* A document that seeks an action from the trial court "cannot also serve as a request for notice triggering the State's duty under Article 37.07, § 3(g)." *Id.*; *see also Espinosa v. State*, 853 S.W.2d 36, 39 (Tex. Crim. App. 1993) ("While we may assume the State makes itself aware of the contents of a discovery motion, the State need not comply with requests contained in a discovery motion until the trial court orders it to do so."). We review a trial court's ruling on the admission of extraneous offense evidence under an abuse of discretion standard. *See McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005).

Appellant's "Motion for Discovery and Limiting Instructions to the Jury" stated that the defense "hereby gives timely notice of its right and request to have reasonable notice of such acts." Nevertheless, this motion ultimately sought an order from the trial court. Similarly, Appellant's "Motion to Discover State's Extraneous and/or Unadjudicated Acts of Misconduct to be Offered at Guilt or Punishment" asked the trial court to require the State to disclose any extraneous acts to defense counsel by thirty days before trial. Neither of these documents served as a proper "timely request" under Article 37.07, § 3(g). *See Mitchell*, 982 S.W.2d at 427 ("[W]hen a document asks the trial court to

enter an order and it also asks the State to provide notice, the document is insufficient to trigger the duty to provide notice under Art. 37.07, § 3(g).").

Appellant's pleadings were—as titled—motions for discovery. Therefore, "it [was] incumbent upon him to secure a ruling on his motion in order to trigger the notice requirements." *See Espinosa*, 853 S.W.2d at 39. Appellant secured rulings on his motions, but both rulings were denials. Therefore, the State was not required to comply with the discovery motions and the motions were "insufficient to trigger the duty to provide notice under Art. 37.07, § 3(g)." *See Mitchell*, 982 S.W.2d at 427.

Even if we assume that Appellant's motions triggered the State's duty to provide notice and the State failed to comply with the notice requirements, Appellant has not demonstrated harm. Error in admitting extraneous offense evidence when the State fails to comply with the notice requirements of Article 37.07, § 3(g), is statutory, not constitutional, error; therefore, we apply the test in Rule of Appellate Procedure 44.2(b). *Cf. Hernandez v. State*, 176 S.W.3d 821, 824 & n.6 (Tex. Crim. App. 2005) (applying the Rule 44.2(b) non-constitutional harm standard to a violation of Rule 404(b)'s notice requirements). A failure to provide reasonable notice in compliance with the statute "does not render the evidence inherently unreliable, but instead raises a question about the effect of procedural noncompliance." *Id*. at 825 (quoting *Roethel v. State*, 80 S.W.3d 276, 282 (Tex. App.—Austin 2002, no pet.)). The notice requirement's purpose is to allow a defendant to prepare to meet the State's extraneous act evidence. *Id*.

The State notified Appellant in 2017 that prosecutors intended to call J.G.D. as a witness at trial and also provided a list of the abusive acts they planned to show that Appellant committed against B.L. The notice document did not include dates for each act.

However, the record shows that B.L. only lived with Appellant for three or four months, so the available time frame was narrow. And the enumerated misconduct was particular and peculiar. Further, the record suggests that defense counsel was given access to the videotaped statements that J.G.D. and D.D. made six years earlier, in which the boys discussed the same conduct. *See, e.g.*, *Hernandez*, 176 S.W.3d at 826 ("Surely, having been given the complete tape recordings, appellant's counsel listened to them and thus was in a position to develop evidence to mitigate their impact."). Defense counsel's failure to request a continuance further indicates that they did not need additional time to respond to J.G.D.'s testimony—they knew what he was going to say.

Appellant has failed to show how his defense strategy would have differed had the State provided more detail about J.G.D.'s expected testimony or how his defense was "injuriously" affected by the State's imperfect notice. *See id*. ("[A]ppellant has failed to make any showing of how his defense strategy might have been different had the State explicitly notified him that it intended to offer the complete tape recordings at trial, or how his defense was 'injuriously' affected by the State's failure to provide reasonable notice."). We overrule Appellant's thirty-third point of error.

C.   *Violation of the Rule*

The purpose of Rule 614 ("the Rule") is to "'prevent the testimony of one witness from influencing the testimony of another' . . . by one witness either overhearing the testimony of another witness or talking to that witness regarding his testimony." *Webb v. State*, 766 S.W.2d 236, 239 (Tex. Crim. App. 1989) (citations omitted); *see also Russell v. State*, 155 S.W.3d 176, 179 (Tex. Crim. App. 2005).

A trial court's decision to allow testimony from a witness who has violated the Rule is a discretionary matter. *Bell v. State*, 938 S.W.2d 35, 50 (Tex. Crim. App. 1996). In reviewing the court's decision to allow the testimony, we consider whether or not the defendant was prejudiced by the witness's violation. *Id*. We have explained that a Rule violation "is not in itself reversible error, but only becomes so where the objected-to testimony is admitted and the complaining party is harmed thereby." *Webb*, 766 S.W.2d at 239–40 (citations omitted). A showing of harm involves two criteria:

> (a) did the witness actually confer with or hear the testimony of the other witness; and
>
> (b) did the witness's testimony contradict the testimony of a witness from the opposing side or corroborate the testimony of another witness he had conferred with or had otherwise actually heard.

*Id*. at 240.

In assessing harm, we examine whether the witness's testimony was influenced by the statements he heard in violation of the Rule. *See Russell*, 155 S.W.3d at 181 ("The question in assessing the harm of allowing [the witness] to remain in the courtroom is whether he was influenced in his testimony by the testimony he heard."). A Rule violation is non-constitutional error, and we will disregard it unless it affects an appellant's substantial rights. S*ee* TEX. R. APP. P. 44.2(b).

In the instant case, the prosecutors essentially conceded that the State ran afoul of criterion (a) by bringing J.G.D., D.D., Jeri, and Joys together for the meeting to discuss J.G.D. and D.D.'s anticipated testimony. Accordingly, the trial court ruled that J.G.D. and D.D. could not testify before the jury at the guilt phase. However, at the punishment phase, the court allowed J.G.D. to testify before the jury about Appellant's abuse of B.L.

With regard to criterion (b), Appellant argues that J.G.D.'s testimony was influenced by—and corroborated—the statements of other State witnesses. The record shows that the meeting in the prosecutor's office focused on J.G.D. and D.D.'s expected guilt-phase testimony about Appellant's abuse of B.L. Jeri and Joys testified at the punishment phase about unrelated matters. We find that the record does not show that J.G.D.'s testimony corroborated or was influenced by Jeri's and Joys's statements.

J.G.D. and D.D. independently testified outside the jury's presence that they did not learn or recall anything new during their meeting with the prosecutor. And they did not discuss "what anyone else may have testified to." The boys discussed the content of their prior, independent videotaped statements with the prosecutor, who admonished them to tell the truth. D.D. averred that there was no way that he and J.G.D. could forget the content of their videotaped statements "because it was tragic. . . . [E]verything we seen is stuck in our head[s]." The trial judge apparently found the boys credible, ruling that J.G.D. would testify "in accordance with his oath, irrespective of that meeting." Further, J.G.D. could not have been influenced by—or have corroborated—D.D.'s trial testimony because D.D. did not testify at trial (other than his testimony outside the presence of the jury regarding the alleged Rule violation). Additionally, the record does not reflect that J.G.D.'s testimony directly contradicted any defense witness's testimony.

Based on the record before us, we find that the trial court did not abuse its discretion in finding that the statements that J.G.D. heard in the meeting would not influence his punishment phase testimony. Any violation of the Rule that may have occurred did not affect Appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). Appellant's thirty-fourth point of error is overruled.

We affirm the judgment and sentence of the trial court.


DELIVERED:                    June 30, 2021
DO NOT PUBLISH